**In re CONSUMERS POWER COMPANY DERIVATIVE LITIGATION.**

**Master File No. 87–CV–60103–AA.**

United States District Court,
E.D. Michigan, S.D.

Aug. 28, 1990.

ORDER ACCEPTING MAGISTRATE'S REPORT AND RECOMMENDATION

LA PLATA, District Judge.

The Court has reviewed the Magistrate's Report and Recommendation submitted in this case and any objections filed thereto. The Magistrate's Report and Recommendation is hereby accepted as the findings and conclusion of the Court. Accordingly,

IT IS ORDERED that defendants' motion to terminate this lawsuit is GRANT-ED, and the derivative claim is dismissed with prejudice.

MAGISTRATE'S REPORT AND RECOMMENDATION TO DISMISS

Filed July 20, 1990.

STEVEN D. PEPE, United States Magistrate.

## TABLE OF CONTENTS

I. Background Facts and Procedural History ............................... 457

II. The Standard for Judicial Review ....................................... 459
    A. Sufficiency of the Rule 23.1 Allegations and Rule 56 ................. 459
    B. Burden of Proof and the Business Judgment Rule .................... 464

III. The Summary Judgment Standard of Review ........................... 469

IV. Undisputed Facts ..................................................... 470

V. Plaintiffs' Assertions Regarding the Wrongfulness of the Board's Decision Rejecting Their Demand ............................................... 471
    A. Plaintiffs' General Allegations ...................................... 471
        1. Plaintiffs' Claims of Conflict of Interest ........................... 472
            (a) The Honigman, Miller, Schwartz & Cohn Conflict .............. 472
            (b) Plaintiffs' Claims Regarding the Barris, Sott, Denn and Driker Conflict ..................................................... 473
        2. Plaintiffs' Claims Regarding the Thoroughness of the Advisory Committee's Inquiry ........................................... 473
            (a) Defendants' Alleged Failure to Consider the Merits or Other Potential Damages ........................................... 473
            (b) Plaintiffs' Claims Regarding Defendants' Failure to Consider the Option of Remaining "Neutral" ............................. 474

VI. Analysis ............................................................. 474
    A. The Conflict of Interest Claims ..................................... 474
        1. The Applicable Conflict of Interest Standards ...................... 474
        2. General Analysis of Whether the Advisory Committee was Tainted by Conflicts of Interest of Either Honigman, Miller, Schwartz & Cohn or Barris, Sott, Denn & Driker .................................. 476
            (a) The Barris, Sott, Denn & Driker Firm ....................... 476
            (b) Honigman, Miller, Schwartz and Cohn ....................... 478
        3. Analysis of BSD & D and HMS & C Conduct Under Plaintiffs' Case Authority on Conflicts of Interest .............................. 479
    B. The Lack of Thoroughness Claims ................................... 483
        1. Failure to Review the Merits and Undertake a Damage Study ..... 483
        2. Failure to Consider the Option of Remaining "Neutral" ............ 486

VII. Conclusion & Recommendation ......................................... 488

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

Certain shareholders of Consumers Power Company (Consumers) brought a derivative action against Consumers as nominal defendant, as well as against 18 past and present directors and officers (the "individual defendants") (Case No. 84–CV–3788–AA). The suit alleged mismanagement, misrepresentation, corporate waste, and breach of fiduciary duties by the individual defendants in connection with the construction of a nuclear power plant in Midland, Michigan. They accused the individual defendants of concealing construction problems and financial difficulties of Consumers. Plaintiffs alleged violations under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), by causing the issuance of materially false and misleading proxy solicitation materials. The claims of breach of fiduciary duty included overstating earnings which inflated executive bonuses, and failing to disclose adverse information regarding construction delays, cost overruns, and material defects in the construction of the Midland Nuclear Plant. Noting that the Michigan Public Service Commission had refused to allow the majority of the construction costs of the Midland plant to be passed on to the ratepayers, plaintiffs asserted that Consumers shareholders would likely bear the burden of billions of dollars in construction costs for a nuclear plant that was never completed. Plaintiffs alleged that these misdeeds resulted in: (1) Dow Chemical Company, which had an agreement with Consumers to purchase cogenerated steam, initiating a suit against Consumers; and (2) Consumers investors bringing a class action for fraud and securities law violations. Plaintiffs claimed that the monies to be paid out for such suits constituted a waste of corporate assets and argued that those costs should be assessed against the directors.

On July 25, 1986, Judge Charles Joiner granted defendants' motion to dismiss this complaint under Fed.R.Civ.P. 23.1 for failure of the plaintiffs to make a demand on the company to initiate suit against its directors. In his decision, Judge Joiner adopted the strict standard for excusing demand by requiring plaintiffs to plead self-dealing or some other breach of the duty of loyalty.[1] He rejected those opinions that suggested demand on the board could be excused under Rule 23.1 upon some lesser standard, such as breach of the duty of care (i.e. negligence or, more likely, gross negligence).[2] In dismissing the earlier derivative action, Judge Joiner found:

> [T]he plaintiffs have not made any allegations which support excusing demand in this case.... Since demand is not excused, the plaintiffs' complaint must be dismissed. The dismissal is without prejudice so that the plaintiffs can make their demand on the company. If the demand is refused, plaintiffs are free to file this action again.

*In Re Consumers Power Company Derivative Litigation,* 111 F.R.D. 419, 428 (E.D. Mich.1986).

By letter of August 15, 1986, plaintiffs demanded that the Consumers board of directors take action on the claims in their federal complaint. On September 3, 1986, the board referred the demand to a newly created Advisory Committee.

The Advisory Committee consisted of four directors who were not named defendants and who joined the board after the events that gave rise to the derivative suit.[3] This Advisory Committee retained counsel

---

**1.** *See, e.g., Galef v. Alexander,* 615 F.2d 51 (2d Cir.1980); *Heit v. Baird,* 567 F.2d 1157 (1st Cir. 1977).

**2.** *See, e.g., Hall v. Aliber,* 614 F.Supp. 473, 478 (E.D.Mich.1985); *Lewis v. Curtis,* 671 F.2d 779, 786 (3d Cir.) (rejecting *Heit's* strict standard), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *Allison v. General Motors Corp.,* 604 F.Supp. 1106, 1114 (D.Del.), *aff'd. without op.,* 782 F.2d 1026 (3rd Cir.1985); *Gro-*

bow v. Perot, 539 A.2d 180, 188–89 (Del.1988); *Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984) (approval of an egregious transaction).

**3.** At an earlier hearing in this case, Consumers' counsel indicated that of the ten members of the board of directors who ultimately considered the matter, six of them were named as defendants. The other four directors, who were not defendants, constituted the Advisory Committee.

and undertook an investigation regarding the stockholders' demand. It concluded unanimously that the demand should be rejected because asserting the claims in the derivative complaint would not serve the best interest of Consumers. The Advisory Committee presented its recommendations to the board at a meeting on November 5, 1986. At that meeting, the board unanimously determined that to act on the claims contained in the derivative complaint "would not be in the best interest of the corporation."

On November 14, 1986, plaintiffs' counsel requested a copy of the Advisory Committee Report, as well as information on the identity of the Committee members, the procedure by which they arrived at their recommendation, and any business relation they had with board members and Committee consultants. The information and document request was rejected on December 2, 1986.

On February 6, 1987, plaintiffs commenced this action by filing their Second Amended Consolidated and Supplemental Complaint (Second Complaint). Instead of asserting demand futility, as did their earlier complaint, they recited the procedural history of the case since the dismissal of the first claim. The Second Complaint is otherwise similar to the complaint dismissed in the first action. The Second Complaint makes no allegation that the board's decision not to pursue the derivative claims was a wrongful decision and not a valid exercise of the board's business judgment.

On April 8, 1987, defendants filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6) or alternatively under Fed.R.Civ.P. 23.1, asserting that the plaintiffs had failed to allege that the board's refusal of their demand to pursue the derivative action was not a legitimate exercise of the board's business judgment.[4]

This Court accepted my earlier Report and Recommendation, dated October 9, 1987, recommending that this motion to dismiss be denied without prejudice to the defendants' right to bring a future motion to terminate. Judge Joiner's earlier dismissal applied the strict standard for excusing demand, and determined that the complaint's allegation of a past breach of the duty of loyalty by the majority of the directors was insufficient to make a demand futile. Yet, this determination did not preclude later judicial review of whether other circumstances might bar application of the business judgment rule to a subsequent board rejection of plaintiffs' demand and a related motion to terminate this derivative action. In order to give the plaintiffs an opportunity to evaluate whether the rejection of their demand was wrongful, the Court granted the plaintiffs limited discovery regarding the decision of the Consumers' board not to pursue the derivative claims.

Following this period of discovery, defendants renewed their motion to terminate. In support of their current response to defendants' second motion to terminate, plaintiffs use little of the discovery that was provided them to determine whether the Board's rejection of the shareholders' demand was wrongful.[5] Plaintiffs' primary claim is that conflicts of interest of the attorneys representing the Advisory Committee and those presenting evidence to the Advisory Committee tainted the objectivity of the information obtained by the Advisory Committee, upon which the

---

4. Fed.R.Civ.P. 23.1 provides that in a derivative action by shareholders:

   [T]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

5. Notwithstanding the extensive discovery undertaken by plaintiffs, other than the time sheets of the Honigman firm, limited excerpts of the Moscow deposition, the Tuttle deposition

and report, the Mikelonis report, and the Driker report, the only other evidentiary submission by the plaintiffs in support of their claims of wrongfulness is the affidavit of Elwood Simon noting that the copy of the Consumers Power report of the board advisory committee and supplemental appendix, dated November 5, 1986, submitted to this Court is equivalent to the original document which was inadvertently defaced and written upon during the discovery process.

board's decision was ultimately based. Plaintiffs assert that this tainted advice and information undermined the adequacy of the investigation and the disinterested independence necessary for a good faith rejection of their demand on the board. Plaintiffs also challenge the Advisory Committee's failure to consider the substantive merits of the underlying shareholders' claims of wrongdoing by the defendant directors.

Finally, plaintiffs argue that the Advisory Committee and board, in addition to considering the plaintiffs' actual demand that Consumers sue certain of its directors, should have considered the unstated, but "implicit," possibility of remaining neutral and acquiescing in the plaintiffs' derivative suit against these directors.

The Advisory Committee considered the impact of the derivative action on various business pursuits and other pending litigation, including: (1) Consumers' pending rate case before the Michigan Public Service Commission; (2) its financial and business plans; (3) the pending class action securities fraud case; (4) the then pending Securities and Exchange Commission investigation; (5) the then pending litigation with Dow Chemical; and (6) its impact on Consumers' negotiations with Bechtel Corporation, which had attempted to build the ill-fated nuclear plant. The Committee concluded that, even assuming Consumers could prevail on the derivative claims against its directors, the benefits to be gained from the derivative action were outweighed by the negative impact of the de-

rivative action on these other corporate pursuits and lawsuits.

The legal sufficiency of plaintiffs' theories challenging the objectivity and thoroughness of the Advisory Committee investigation and decision—attorney conflict of interest, its failure to explore the merits of the claim, and an assertion the board should have remained "neutral"—involve no disputed issues of material fact and can be determined as a matter of law.

## II. THE STANDARD FOR JUDICIAL REVIEW

### A. Sufficiency of the Rule 23.1 Allegations and Rule 56:

In my earlier Report and Recommendation, I noted that where the corporation refuses a demand and then denies the stockholders' request for any information about the reasons for the refusal or the procedures and persons involved in making the refusal, the plaintiffs face an impossible burden under Fed.R.Civ.P. 23.1 if required to detail the facts explaining "the plaintiff[s'] failure to obtain the action" requested. Where a defendant corporation refuses to disclose information "peculiarly in the possession of the defendants themselves," Rule 23.1 should not be a bar to proceeding with some limited discovery regarding the reasons and procedures for denying the stockholders' demand.[6] Otherwise, defendants would have not only the business judgment rule to protect their demand refusal, but in many situations would also have a "Catch–22"[7] procedural hurdle in Rule 23.1 which their silence could prevent plaintiffs from clearing or even approaching.[8] Noting that derivative suits

---

6. Chief Judge Cooke in his dissent in *Auerbach v. Bennett*, 47 N.Y.2d 619, 637, 393 N.E.2d 994, 1104–05, 419 N.Y.S.2d 920, 930 (1979), noted the dilemma if the plaintiff's standing and demonstration of "wrongfulness" had to be undertaken with no discovery:

> Since the continuation of the suit is dependent, in large measure, upon the motives and actions of the defendants and the special litigation committee, and since knowledge of these matters "is peculiarly in the possession of the defendants themselves," summary judgment should not be granted prior to disclosure proceedings.

The majority in *Auerbach* had not allowed discovery since the plaintiffs had not identified

fruitful areas for discovery. Judge Cooke wrote:

> The result ... is to place the intervenor in a classic "Catch–22" situation, denying him disclosure because he has not come forward with facts ... which by their very nature are discernible only after disclosure.

7. See Judge Cooke's comments, n. 6, *supra*.

8. *Lewis v. Curtis*, 671 F.2d 779 (3rd Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982), expressed concern about overexpansive use of Rule 23.1 "to create a pleading defense to a fact dispute." 671 F.2d at 786.

were equitable in nature, I determined that in a case where plaintiffs pled a *prima facie* case of past corporate wrongdoing, Rule 23.1 was not intended to preclude all further judicial proceedings where plaintiffs made a demand which was refused, and a request for reasons was also denied by the defendants. The Notes of the Advisory Committee on Rule 23.1 acknowledge that a "court has inherent power to provide for the conduct of the proceedings in a derivative action, including the power to determine the course of the proceedings...." In the two principal cases setting guidelines for this district on motions to terminate derivative actions, *Genzer v. Cunningham*, 498 F.Supp. 682 (E.D.Mich. 1980) (Guy, J.) (applying Michigan law), and *Hasan v. CleveTrust Realty Investors*, 729 F.2d 372 (6th Cir.1984) (applying Massachusetts law), plaintiffs were provided with an opportunity to engage in discovery before the court ruled on the defendants' motion to terminate.[9]

In my earlier Report, I also determined that the motion to terminate a derivative action should be considered under the summary judgment standards of Fed.R.Civ.P. 56. This determination was based upon the fact that both *Genzer*[10] and *Hasan*[11] used the summary judgment standard to decide a motion to terminate that had been recommended by a special litigation committee. *Hasan* states that in determining whether to terminate a derivative action after such a recommendation by a special litigation committee, "a reviewing court must scrutinize the record to determine whether a genuine issue of material fact exists as to the committee's independence, good faith and procedural fairness." 729 F.2d at 376.

*Holmstrom v. Coastal Industries, Inc.*, 645 F.Supp. 963, 987–88 (N.D.Ohio 1984) (applying Ohio law), also reads *Hasan* as precluding dismissal of a derivative action where there is a genuine issue of material fact about the independence, good faith, or procedural fairness of the special litigation committee that recommended dismissal.

[The *Holmstrom* ] Court construes *Hasan* to withdraw from the trial court the general power to enter an adjudication with respect to the question of independence, good faith and procedural fairness of the LOC [Litigation Oversight Committee] but rather narrowly focuses the inquiry of the trial court, where the work of the LOC is challenged, on the question of whether genuine issues of material fact do or do not exist in the context of the LOC's independence, good faith and procedural fairness.

\*     .  \*       \*       \*       \*       \*

*Hasan* states unequivocally that where there are genuine issues of material fact with respect to any of those issues, summary judgment is inappropriate.

*Holmstrom*, 645 F.Supp. at 987–88.

While I feel this Court is bound by the *Hasan* standard, I am troubled by some of its implications for the efficiency of judicial resolution of these issues, as well as its impact on reallocation of power and bargaining endowments between corporate management and disgruntled stockholders. Increasing the frequency, intensity, and expense of judicial review of corporate decision-making may enhance the quality of corporate behavior. Yet there are substantial policy considerations that would suggest it could have an adverse effect on the

---

**9.** In numerous other derivative cases considering a defense motion to terminate, discovery had been made available to plaintiff before the Court allowed termination of the derivative action. *Galef v. Alexander*, 615 F.2d 51, 56 (2nd Cir.1980); *Lewis v. Anderson*, 615 F.2d 778 (9th Cir.1979); *Maldonado v. Flynn*, 485 F.Supp. 274, 278 n. 28 (S.D.N.Y.1980), *rev'd in part, Maldonado v. Flynn*, 671 F.2d 729 (2d Cir.1982); *Abramowitz v. Posner*, 672 F.2d 1025, 1027, 1029, 1036 (2d Cir.1982). Even in the much cited case of *Allison on behalf of General Motors Corp. v. General Motors Corp.*, 604 F.Supp. 1106, 1119 (DC Del 1985), *aff'd without op.*, 782 F.2d 1026

(3rd Cir.1985), that decided a Rule 23.1 motion to dismiss "solely on the face of the complaint as amended to reflect wrongful rejection of the demand," limited discovery was permitted "relevant to the motion to dismiss." *Id.* at 1110. *But see Levine v. Smith*, No. 8833, Fed.Sec.L.Rep. ¶ 93,581 (1987 Westlaw 28885) (Del.Ch., Dec. 22, 1987), where Vice Chancellor Jacobs held that discovery was "not appropriate" in a "demand refused" case.

**10.** 498 F.Supp. at 697.

**11.** 729 F.2d at 374.

quality of both corporate decisions and the persons selected to serve as directors. It will likely increase the frequency and the settlement value of derivative suits of marginal merit.[12]

I believe *Hasan* should be read in the context of its specific facts. Neither *Hasan* nor *Genzer* discuss Fed.R.Civ.P. 23.1, nor does either refer specifically to a demand being made on the board.[13] Applying the *Hasan* and *Genzer* summary judgment approach to a *demand required* case, as well as to a *demand excused* case, is a departure from Delaware law.[14] While I realize that a federal court is not *Erie*-bound on a procedural issue under Rule 23.1 or under Rule 56 as was involved in *Hasan*, the lessons from Delaware (where 50% of the Fortune 500 companies are incorporated) may prove instructive as to how federal courts should apply their procedural rules. In the absence of clear Michigan law, Michigan courts commonly refer to Delaware law, which is respected and often followed on corporate matters.[15]

Delaware courts have a similar Rule 23.1.[16] Consistent with all federal courts they determine the question of whether demand is excused "upon the allegations of the complaint." *Aronson v. Lewis*, 473 A.2d 805, 808 (Del.1984). The relevant time period for this inquiry is generally the time at which the defendant board members approved the allegedly wrongful action. If demand is not excused, once the demand is made and refused, Delaware courts again limit their Rule 23.1 review to "the allegations of the complaint itself" to determine if the refusal was wrongful and not protected by the business judgment rule. *Levine v. Smith*, No. 8833, Fed.Sec.L.Rep. ¶ 93,581 (1989 Westlaw 150784) (Del.Ch., Nov. 27, 1989) (*Jacobs, V.C.*). See also *Allison v. General Motors, supra,* 604 F.Supp. at 1119; *Lewis v. Hilton,* 648 F.Supp. 725 (N.D.Ill.1986). The relevant time period for this inquiry is the time at which the board rejected the stockholders' demand that the corporation sue certain of its current and/or former directors or officers. Only if demand is excused as futile do Delaware courts go beyond the pleadings and treat a subsequent defense motion to terminate "akin to proceedings on summary judgment" or a "hybrid summary judgment motion for dismissal." *Zapata Corp. v. Maldonado,* 430 A.2d 779, 787–88 (Del.1981). The relevant time period for this inquiry is the time at which the special litigation or other committee of the board decided to seek to terminate the stockholders' derivative suit.

*Hasan* appears to be a demand excused case similar to *Zapata*.[17] In such a demand excused case, Delaware courts also would apply a summary judgment-type standard of review to a motion to terminate. Had *Hasan* specifically addressed a motion to dismiss under Fed.R.Civ.P. 23.1, instead of under Rule 56 as it was presented to the court in that case, the Sixth

---

12. *See, e.g.,* Dooley and Veasey, *The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared,* 44 Bus. Lawyer 503 (1989).

13. The *Genzer* opinion, 498 F.Supp. at 687, which was not a self-dealing or breach of loyalty case, suggests that a demand was made and denied since the plaintiffs were arguing that "once the [demand] requirement is met without success, the derivative suit may proceed." *Hasan,* on the other hand, appears to be an "entrenchment case" for which demand is excused. See text below at 462.

14. In this report, I use the terms "demand required" and "demand refused" to refer to the same type of cases and to distinguish such cases from "demand excused" or "demand futility" cases.

15. *See, e.g., Plaza Secur. Co. v. Fruehauf Corp.,* 643 F.Supp. 1535, 1543 n. 5 (E.D.Mich.1986); *Hall v. Aliber,* 614 F.Supp. 473, 477 (E.D.Mich. 1985).

16. The Delaware Chancery Court notes that its Rule 23.1 is "virtually identical to Federal Rule 23.1." *Kaplan v. Peat, Marwick, Mitchell & Co.,* 529 A.2d 254, 258 (Del.Ch.1987), *rev'd on other grounds,* 540 A.2d 726 (Del.1988).

17. *Hasan* involved board members' use of corporate funds to acquire company stock at a premium and resell it at a substantial discount to a friendly buyer to avoid a takeover. This self-interested effort to use corporate funds to preserve the directors' positions breached a duty of loyalty. This is a classic "entrenchment" case in which a Rule 23.1 demand is generally excused.

Circuit might have elaborated on some of the unique policy considerations behind Rule 23.1 that require special treatment for this "hybrid summary judgment motion for dismissal." [18] The Sixth Circuit in *Hasan* was not given an opportunity to consider the special nuances of a Rule 23.1 motion to terminate in a demand refused setting where different standards and burdens of proof might be appropriate.

While this Court was indulgent in evaluating the sufficiency of the pleading under Rule 23.1 in a Catch–22 situation where Consumers refused to provide information on the reasons and procedures for its refusal of the demand, fairness to the plaintiffs does not require such a relaxed standard once they have been given discovery on the independence, good faith, and procedural adequacy of the board's special Advisory Committee.[19]

In using this Court's inherent power to allow limited discovery on the independence, good faith, and procedural adequacy of the Consumers Advisory Committee, it might have been appropriate to require plaintiffs thereafter to amend their complaint to "allege with particularity" under Rule 23.1 why the board's decision to reject the demand and terminate was "wrongful." Such an amendment would then allow a review of the sufficiency of the plaintiffs' claims of wrongfulness on the pleadings in a demand refused case as is done in Delaware, and seems intended by the Rule 23.1 "particularity" pleading requirement. Requiring an amendment to the complaint after limited discovery might avoid the necessity of reviewing the underlying factual evidence and risking unnecessary public disclosure of sensitive internal corporate documents where plaintiffs have no adequate factual grounds to claim the board's refusal of their demand was wrongful.[20]

**18.** Rule 23.1 seeks to balance the interests of stockholders with those of the corporation where a derivative action threatens to "impinge on the managerial freedom of directors," *Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984), and is "a challenge to a board of directors' managerial powers." *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990). The demand requirement has long been recognized as a concession to the directors' prerogative to control a corporation's business and affairs. *See, e.g., Hawes v. Oakland,* 104 U.S. 450 (Otto) 26 L.Ed. 827 (1882).

Rule 23.1 "is a marked departure from the 'notice' pleading philosophy of the Federal Rules of Civil Procedure." *Allison, supra,* 604 F.Supp. at 1112. "Rule 23.1 requires a plaintiff to go beyond the notice pleading requirement. The plaintiff must make particularized allegations." *In re Gen. Motors Class E Stock Buyout Secur. Litigation,* 694 F.Supp. 1119 (Del.1988). A derivative complaint under Rule 23.1 must be verified and allege the facts demonstrating the board's refusal of a demand was wrongful. Short of this, stockholders cannot disqualify the board of directors from controlling the corporation's litigation.

The Delaware Supreme Court has noted that their Chancery Court Rule 12(b)(6) has a less stringent standard than does Rule 23.1 and notes that in reviewing a Rule 23.1 motion to dismiss "[a] trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences." *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988).

**19.** Indeed, I assumed plaintiffs would have consented to termination if they "failed to discover facts that gave them reasonable cause to chal-

lenge the good faith, independence, and thoroughness of [the Advisory Committee's] determination that [the] derivative suit should not be pursued." Report and Recommendation, October 9, 1987, at 47.

**20.** For many of the policy considerations stated in *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), courts should accord corporations a degree of protection from compulsory public disclosure of information obtained in an evaluation of possible corporate wrongdoing. Such investigations and potential remedies and responses will often relate to contexts and corporate strategies that are confidential. The candor and thoroughness that is desirable in such intracorporate reviews of possible wrongdoing, and the means of reacting to it and limiting harm to the corporation, are greatly inhibited when the evaluators fear public exposure and possible misinterpretation and/or mischaracterization of their work product or other business plans. Once a court is brought into the review process, the public's right to know about the workings of its governmental branches makes protection of such corporate confidences more difficult. Only the most compelling reasons will allow non-public judicial review. The Seventh Circuit affirmed Judge Grady's ruling in a demand required case that a special litigation committee report admitted into evidence on a motion to terminate a stockholders' derivative action should be made available to the newspapers. *In re Continental Illinois Securities Litigation,* 732 F.2d 1302 (7th Cir.1984). *See also Brown & Williamson Tobacco Corp. v. Federal Trade Comm'n.,* 710 F.2d 1165, 1179–80 (6th Cir.1983), *cert denied,* 465 U.S. 1100, 104

Hopefully the Sixth Circuit will give trial courts some further guidance on appropriate procedures under Rule 23.1 if they are called upon to review the grant of limited discovery and other procedures followed in this case.[21]

S.Ct. 1595, 80 L.Ed.2d 127 (1984); *Joy v. North,* 692 F.2d 880, 894 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983). The official Comment to the 1988 Proposed Changes to the Model Business Corporation Act also anticipates that courts will make a public review of the report prepared by a corporation seeking to terminate a derivative action under § 7.44(a). Committee on Corporate Laws, *Changes in the Model Business Corporation Act—Amendments Pertaining to Derivative Proceedings,* 44 Bus. Lawyer, 543, 554 (1989). Almost any corporate misjudgment or misfortune can serve as a fertile ground in which disgruntled stockholders could sprout claims of a breach of the duties of due care. Their Rule 23.1 demands would generally be refused by the board of directors. If, in such demand refused cases, stockholders can thereafter on a motion to terminate threaten public disclosure of the corporation's special and confidential reports, this would strengthens the stockholders' hand and bargaining power because of the potential risk of embarrassment or actual harm to the corporation. This might invite less scrupulous and self-interested stockholders to attempt to "graymail" the corporation into settlement. ["Graymail" is a term that gained popularity in criminal cases involving issues of national security, such as those involving the Watergate White House "Plumbers," and the perjury charges against Richard Helms and those against ITT executives concerning the CIA's involvement in Chile's 1970 presidential election. Ragovin, *'Graymail:' Shaded Variant of a Darker Hue,* National Law Journal, March 26, 1979 at 42–44. Criminal defendants have threatened to disclose national security information as an "essential" part of their defense unless some or all criminal charges are dropped. Such threats of disclosure led to certain charges being dropped in the Iranscam prosecutions, and are presently discussed by the press in the context of the Noriega prosecution.] This increased bargaining leverage for stockholders threatening public disclosure of confidential corporate information and corporate thinking is greater than the ordinary "nuisance value" of a lawsuit of no merit. Thus, expanded judicial review of corporate decision-making over alleged wrongdoing, with its threat of likely public disclosure, increases the "settlement value" of marginal derivative suits and will likely lead to an increase in derivative "strike suits" intended to leverage a quick settlement. It is also likely to limit internal corporate reviews in scope and in documentation, making them a less effective instrument of corporate policy.

21. When summary judgment is not appropriate because disputed issues of material fact do exist, it would be helpful for the Sixth Circuit to determine whether the trial court can "enter the adjudication" (*Holmstrom*) before trial, and make the necessary factual findings on independence, good faith, and procedural adequacy. The demand issues involved under Rule 23.1 determine the critical question of who will act for the corporation in the derivative suit—the board or the stockholder-plaintiffs. *Levine v. Smith supra,* 1989 Westlaw 150784 at 6. The question of determining whether the board (alone or acting through a special committee) is "legally disabled from acting on the corporation's behalf" (*Levine*)—like a motion to disqualify counsel or to dismiss for qualified immunity from suit under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)—is one that cannot practically be left until the trial. It is a preliminary and fundamental issue that should be resolved before undertaking the enormous expense of pretrial discovery on the merits.

Since a challenge over who contols the litigation and whether the corporate directors can decide to dismiss the case needs prompt resolution, the district court should have the power to resolve any factual dispute even where controverted material issues of fact make summary judgment inappropriate. Compare, *Gould, Inc. v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 451 (6th Cir.1988), where the Sixth Circuit noted the procedural flexibility available to district courts in resolving pretrial any factual disputes under the Foreign Sovereign Immunities Act:

In the absence of statutory direction, the district court has considerable discretion in devising the procedure to inquire into the existence of jurisdiction. *Land v. Dollar,* 330 U.S. 731, 735 and n. 4, 67 S.Ct. 1009, 1011 and n. 4, 91 L.Ed. 1209 (1947); *Rogers [v. Stratton Industries, Inc.],* 798 F.2d [913] at 918 [ (6th Cir.1986) ]. Thus the district court may consider affidavits, allow discovery, hear oral testimony, order an evidentiary hearing, or even postpone its determination if the question of jurisdiction is intertwined with the merits.

\* \* \* \* \* \*

Because sovereign immunity is immunity from suit, not just from liability, *see Segni [v. Commercial Office of Spain],* 816 F.2d [344] at 347 [ (7th Cir.1987) ], postponing the determination of subject matter jurisdiction until some point during or after trial would be inappropriate.

Whether a corporation is competent to terminate a derivative suit cannot be postponed until trial. Thus, the issue of whether the board's refusal of a demand was "wrongful", if it cannot be resolved by a summary judgment review, should be determined on the merits when a corporation files its pretrial motion to dismiss. The factual issues of good faith, disinterestedness and thoroughness, as predicates to applying the business judgment rule to the corporation's refusal of a demand, are only indirectly

### B. Burden of Proof and the Business Judgment Rule:

The central premise of corporate law in Michigan and elsewhere is that directors, rather than shareholders, manage the business and affairs of a corporation. This concentration of decision-making authority enhances a corporation's ability to act quickly and efficiently. It is "cheaper and more efficient to transmit all the pieces of information once to a central place" and let the central authority "make the collective decision and transmit it rather than retransmit all the information on which the decision is based." [22] The business judgment rule is a presumption that directors in making business decisions, not involving direct self-interest or self-dealing, act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest. This rule insulates from judicial review and second-guessing even those decisions that turn out to be wrong.[23] This rule protects directors from undue fear of personal liability and encourages the innovation, quick decision, and occasional risk-taking that are important to a corporation's success. It also "protects directors from the harassment of litigators who might otherwise contest ordinary business decisions." Clark, Corporate Law, supra, at 641.

The business judgment rule and the Rule 23.1 demand requirement, which puts it into gear in derivative cases, protect not only the directors. These rules protect the corporation and its stockholders from other stockholders where only the "duty of care" and not the "duty of loyalty" is at issue.[24] Yet, there are limits on centralized corporate management. In more extreme cases, courts are available to enforce corporate

---

related to the earlier alleged wrongful action of the directors and/or officers of the corporation. The whole concept of allowing shareholders to enforce a corporation's right through derivative actions, arose as an issue in equity, *Hawes v. Oakland, supra,* and the Federal Equity Rules. While now treated as a single case, the derivative suit originated as two suits: (1) "a suit in equity against the corporation seeking an order compelling it (2) to bring a suit for damages or other relief against some third person who had caused legal injury to the corporation." Clark, Corporate Law, (Little, Brown & Co. 1986), at 639. Thus, it is consistent with the pedigree of derivative actions that consideration of who can act for the corporation should first be resolved by a judge before a trial on the underlying claim of wrongdoing against third parties which trial may be before a jury.

As Judge Frank Easterbrook noted in his concurring opinion in *Starrels v. First National Bank of Chicago,* 870 F.2d 1168, 1173 (7th Cir. 1989), the demand rule gives the board discretion to "do something" to address and possibly correct the alleged underlying wrong. This board action could be something short of litigation, such as "discharge, demotion, dressing-down, ratification." [The complaint in the case at bar (¶ 24) makes it clear that since the alleged corporate wrongdoing, former C.E.O. John Selby has resigned from Consumers and was replaced on November 1, 1985, by William T. McCormick, Jr., who left a similar position at American Natural Resources Company to take over at Consumers. Mr. McCormick was one of the independent directors serving on the Special Advisory Committee reviewing plaintiffs' demand.] Easterbrook notes that "acts short of litigation could have net benefits exceeding those of litigation." Thus the demand rule was intended to be, in Easterbrook's words, "a form of alternative dispute resolution, much like mediation" that might avoid unneeded litigation. Yet, "on balance, the rule creates more litigation than it prevents. * * * As a way to curtail litigation, the demand rule is a flop." Judge Easterbrook's criticism is particularly true if courts do not have power to make pretrial factual determinations on whether the rejection of a demand deserves the protection of the business judgment rule. If trial courts are limited to summary judgment standards on this preliminary question, with factual disputes over the demand rejection having to await trial on the merits of the underlying challenged conduct of the officers and/or directors, the purpose of the Rule 23.1 demand rule will be substantially eroded. Corporations will be subject to long and expensive litigation, possibly to the detriment of the corporation, where a group of stockholders can establish any disputed fact question over the disinterestedness, good faith or thoroughness of the board's rejection of these stockholders' demand that *litigation,* and nothing less, resolve their dispute over the underlying challenged action.

**22.** K. Arrow, *The Limits of Organization* (1979).

**23.** In Michigan, corporate decision-makers are protected from liability for negligent decisions unless their breach of due care is so extreme that "there has been a clear abuse of discretion as to amount to legal waste." *Good v. Modern Globe, Inc.,* 346 Mich. 602, 609–10, 78 N.W.2d 199 (1956).

**24.** Dooley and Veasey, *supra,* at 520–522.

accountability. Judicial review and second-guessing are possible when the corporate actors are not disinterested and when they lose the protections of the business judgment rule by failing to act in good faith, by lack of thoroughness, or otherwise. Centralized, delegated decision-making, under the fiduciary limits of loyalty and good faith, constitutes the basic contractual understanding between shareholders and directors. In most business decisions involving due care, stockholders want business executives to decide such questions, and not minority stockholders or judges who generally have no special training or inclination for such business decisions.[25] If an investor wants collective decision-making, or the ability to challenge and seek review of all decisions, a *general partnership*, and not a *corporation*, is the appropriate organizational form for such an investor to choose.

The business judgment rule has specifically been accepted by courts for director decisions to terminate stockholder derivative actions. *Auerbach v. Bennett, supra.*[26] "Whether to sue or not to sue is

ordinarily a matter for the business judgment of directors, just as is a decision that the corporation will make bricks instead of bottles." Clark, Corporate Law, *supra*, at 639. As noted by two commentators:

> Obviously, no principled distinction can be drawn between a board's decisions relating to corporate litigation generally and those relating to other business matters. Indeed, a board's decision whether to pursue, settle, or forego litigation is, at bottom, a business decision, as is the board's judgment on the amount of time and effort it wishes to devote to the matter, as is its determination to delegate decisive authority to some other corporate agent. We do not mean to imply that the board's discretion in litigation matters is unbounded, only that the boundaries are coextensive with those for decisions having no forensic overtones.

Dooley and Veasey, *supra*, at 522. The 1988 Proposed Amendments to the Model Business Corporation Act, in Section 7.44, also makes dismissal of a derivative action a business judgment of the corporation.[27]

---

**25.** Corporate leaders, unlike judges and other stockholders, are generally screened from a relatively competitive market for executive talent.

**26.** In *Auerbach* the court precluded judicial review of the merits of a decision that a derivative action should be terminated. *Auerbach* held that the court's review was limited to procedural questions regarding (1) whether the committee members acted with "disinterested independence", and (2) the "appropriateness and sufficiency" of the committee's investigation.

> While the substantive aspects of a decision to terminate a shareholders' derivative action against defendant corporate directors made by a committee of disinterested directors appointed by the corporation's board of directors are beyond judicial inquiry under the business judgment doctrine, the court may inquire as to the disinterested independence of the members of that committee and as to the appropriateness and sufficiency of the investigative procedures chosen and pursued by the committee.

*Id.* 47 N.Y.2d at 623–24, 393 N.E.2d at 996, 419 N.Y.S.2d at 922. *Auerbach* noted that "courts are well equipped by long and continuing experience" to make decisions regarding the "methodologies and procedures best suited to the conduct of an investigation of facts and determination of legal liability." *Id.* N.Y.2d at 634, 393

N.E.2d at 1002, 419 N.Y.S.2d at 929. In contrast to the procedures used:

> The substantive decision not to pursue a derivative action falls squarely within the embrace of the business judgment doctrine, involving ... the weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution of many if not most corporate problems.... To permit judicial probing of such issues would be to emasculate the business judgment doctrine as applied to the actions and determinations of the special litigation committee.

*Id.* 47 N.Y.2d at 633–34, 393 N.E.2d at 1002, 419 N.Y.S.2d at 928.

Other courts have taken a similar position that a court can review the independence, good faith, and reasonableness of the investigation of the corporate decision not to pursue a derivative suit, but that the "ultimate conclusion of the committee, under that review, is not subject to judicial review." *Maldonado v. Flynn*, 485 F.Supp. 274, 282, 286 (S.D.N.Y.1980).

**27.** The Committee on Corporate Laws, *supra*, at 549–55. The Act shifts the burden of proof to the corporation when the majority of the board of directors are not disinterested or otherwise independent; otherwise, the burden is on the stockholder-plaintiffs. The stockholders also have the initial burden of proof on the issue of

The Michigan Supreme Court has not yet specifically ruled on whether it would apply the business judgment rule to a decision of a corporation to reject a stockholder demand that the corporation sue its directors. The case law in other jurisdictions and the logic of Dean Robert Clark and other commentators suggest that Michigan courts would apply the rule in such a case. This is the conclusion reached by Judge Ralph Guy in *Genzer:* that "Michigan law would permit a business judgment dismissal of derivative claims...." *Genzer, supra,* 498 F.Supp. at 689. Michigan courts also have not addressed the question of whether the moving party bears the burden of proof in a case involving termination of a derivative action. Neither *Genzer* nor any other federal case in this district or circuit has specifically addressed this question.

After the *Auerbach* and *Genzer* decisions, the Delaware Supreme Court decided to abandon its deferential business judgment approach in *demand excused* cases. *Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del.1981). *Zapata* adopted a stricter level of judicial scrutiny for motions to terminate made upon the recommendation of a special litigation committee in a demand excused situation. While *Zapata* acknowledged that corporations had traditional business discretion to terminate a derivative suit, it cautioned:

> Board members, owing a well-established fiduciary duty to the corporation, will not be allowed to cause a derivative suit to be dismissed when it would be a breach of their fiduciary duty.

430 A.2d at 783. The court noted the distinction between demand refused cases and demand excused cases. In the latter cases, *Zapata* dropped the presumption of applicability the business judgment rule and created a two-step approach for judicial review. First, it shifted the burden of proving the availability of the business judgment rule to the party moving to terminate. It adopted a summary judgment standard of review on the question of whether the special litigation committee acted with independence, good faith, and after an adequate investigation. Failure to meet any of these burdens resulted in a denial of the motion to terminate. If the corporate defendant met the burden of this first level of review, the court could in its discretion proceed to a second step. This discretionary second step allowed the court to substitute its own judgment as to whether continuing the suit was in the corporation's best interests.[28]

whether the majority of the board is not independent. *Id.* at 553.

**28.** With regard to a corporation's motion to dismiss a derivative suit, after review by an independent litigation committee, the *Zapata* court wrote:

The motion should include a thorough written record of the investigation and [the committee's] findings and recommendations. Under appropriate Court supervision, akin to proceedings on summary judgment, each side should have an opportunity to make a record on the motion. As to the limited issues presented by the motion noted below, the moving party should be prepared to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that the moving party is entitled to dismiss as a matter of law. The Court should apply a two-step test to the motion.

First, the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions. Limited discovery may be ordered to facilitate such inquiries. The corporation should have the burden of proving independence, good faith and a reasonable investigation, rather than presuming independence, good faith and reasonableness. If the Court determines either that the committee is not independent or has not shown reasonable bases for its conclusions, or, if the Court is not satisfied for other reasons relating to the process, including but not limited to the good faith of the committee, the Court shall deny the corporation's motion. If, however, the Court is satisfied under Rule 56 standards that the committee was independent and showed reasonable bases for good faith findings and recommendations, the Court may proceed, in its discretion, to the next step.

The second step provides, we believe, the essential key in striking the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation's best interests as expressed by an independent investigating committee. The Court should determine, applying its own independent business judgment, whether the motion should be granted.

430 A.2d at 788–89 (footnotes omitted).

The *Zapata* two-step approach has been criticized as inviting endless open-ended pretrial proceedings. Block & Prussin, *The Business*

While some courts have applied the *Zapata* burden shifting and strict scrutiny test to both demand excused and demand refused cases,[29] Delaware courts[30] and federal courts applying Delaware law[31] have

*Judgment Rule and Shareholder Derivative Actions: Viva Zapata?*, 37 Bus.Law. 27, 62 (1981). The opinion has also been commended as putting an end to judicial abdication in reviewing terminations of derivative actions. Veasey, *Seeking a Safe Harbor from Judicial Scrutiny of Directors' Business Decisions*, 37 Bus.Law. 1247, 1266, 1273 (1982).

29. The court in *In re Continental Illinois Secur. Litigation*, 572 F.Supp 928, 930 (N.D.Ill.1983), *aff'd. on other grounds*, 732 F.2d 1302 (7th Cir. 1984), noted that concerns regarding uninvolved directors having a "there but for the grace of God go I" attitude were equally applicable to special litigation committees involved in both demand rejected cases as well as in demand excused cases:

> In the instant case, we are dealing with a decision made by an allegedly independent committee of directors. Thus, it seems to me, *the issue is the same. The fact that there was no demand in Zapata,* and that the court regarded the case as one where the demand was excused, is not a significant distinction, because in *Zapata,* as here, the question is what effect is to be given the corporate decision recommended by directors who are not alleged to have participated in the wrongdoing. Our inquiry, moreover, is not limited to whether the *Zapata* holding applies precisely to the facts of this case. Rather, the inquiry is what the Supreme Court of Delaware would do in this case. *Zapata* leads me to the conclusion that *the Supreme Court of Delaware would apply the same two-step test to this case that it applied in Zapata itself.* I hold, therefore, that the two-step test applies.

572 F.Supp. at 930. *See also Mills v. Esmark, Inc.*, 544 F.Supp. 1275, 1283 (N.D.Ill.1982):

> Although the *Zapata* opinion does distinguish between demand and non-demand cases, we hesitate to draw the bright line advocated by the Second Circuit. The *Zapata* Court acknowledged that "subconscious" pressure on an ostensibly independent director while passing judgment on his fellow directors might necessitate *some* judicial review beyond the apparent procedural adequacy of the committee's investigation. *Id.* [*See also* Dent, "The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit?" 75 Nw.U.L.Rev. 96 126–27]. These pressures exist regardless of whether a demand has been made on the board. Thus, the existence of a demand on the board, although certainly relevant to the level of appropriate substantive review, does not itself bar all such review in this Court under Delaware law.

*Id.* at 1283.

Yet, in *Mills v. Esmark,* the court did not actually judge the merits of the special litigation committee's treatment of the shareholders' underlying claim other than to evaluate the special litigation committee's good faith and independence. 544 F.Supp. at 1283. Later, after demand was made and refused, Judge Aspen, applying Delaware law, appears to apply a more lenient test and not shift the burden of proof to the corporation in a demand refused case. *Mills v. Esmark, Inc.*, 573 F.Supp. 169 (N.D.Ill. 1983). He applies a modified and narrowed *Zapata* approach in deference to *Zapata's* urging of caution in dismissing derivative claims. 573 F.Supp. at 169. Judge Aspen asserts that in his initial consideration he "applied a test of good faith, independence and reasonable investigation to those claims reviewed by the first [Special Litigation Committee] upon demand by plaintiffs" (i.e. *Zapata,* step 1). 573 F.Supp. at 172. He justified his later review and dismissal with prejudice of the stockholders' remaining claims on the grounds that:

> Plaintiffs have presented no substantive arguments as to why the [Special Litigation Committee's] report was "wrongful" or why deference to the report's conclusions would violate the spirit of the business judgment rule.

30. In *Aronson, supra,* the Delaware Supreme Court reiterated:

> [W]here demand on a board has been made and refused, we apply the business judgment rule in reviewing the board's refusal to act pursuant to a stockholder's demand. *Zapata* at 784 & n. 10. Unless the business judgment rule does not protect the refusal to sue, the shareholder lacks the legal managerial power to continue the derivative action, since that power is terminated by the refusal. *Id.* at 784. We also concluded that where demand is excused a shareholder possesses the ability to initiate a derivative action, but the right to prosecute it may be terminated upon the exercise of applicable standards of business judgment. *Id.* The thrust of *Zapata* is that in either the demand-refused or the demand-excused case, the board still retains the Section 141(a) managerial authority to make decisions regarding corporate litigations.

473 A.2d at 813–14. *See also Levine v. Smith, supra.*

31. *Allison on behalf of General Motors Corp. v. General Motors Corp.*, 604 F.Supp. 1106, 1121 (DC Del.), *aff'd without op.* 782 F.2d 1026 (3rd Cir.1985) ("[In a demand-required context,] a heightened level of judicial scrutiny is not appropriate since, by definition, plaintiff either does not contest the need for demand or, as here, it has been found that demand is not futile").

*Abramowitz v. Posner,* 672 F.2d 1025, 1031 (2nd Cir.1982), (interpreting Delaware law): Where demand upon the corporation has been made and refused, a court will defer to the company's business judgment to forego litigation unless the shareholder can show the

limited the burden-shifting and strict scrutiny test of *Zapata* to demand excused cases.[32] Legal commentators have also argued for a limitation of *Zapata*'s burden shifting and stricter judicial scrutiny to demand excused cases.[33]

While the Sixth Circuit in *Hasan v. CleveTrust Realty, Inc., supra,* applied the *Zapata* standard to a special litigation committee motion to terminate a derivative action instead of the *Auerbach* test, *Hasan* was interpreting Massachusetts law, and

the termination issue arose by way of a defense motion for summary judgment, not a motion under Rule 23.1. While the demand issue was not discussed, it seems clear, as noted above, that *Hasan* constituted a demand excused situation involving the directors' self-interested efforts to entrench their power and "protect their own lucrative positions." 729 F.2d at 373. Thus, I believe *Hasan* is not precedent for applying the *Zapata* standard in a demand refused case.

directors acted wrongfully. Where demand has not been made due to futility, however, the company bears the initial burden of establishing its good faith and independence in seeking termination, and even then, its judgment is subject to the court's subjective scrutiny.

See also, *Stein v. Bailey,* 531 F.Supp. 684, 692 (S.D.N.Y.1982); *In re General Motors Class E Stock Buyout Secur. Litigation,* 694 F.Supp. 1119, 1133 (Del.1988).

**32.** The 1988 Proposed Amendment to the Model Business Corporation Act, while requiring a demand in all cases under § 7.42, retains the demand excused/demand required dichotomy for determining if the corporation or the stockholder has the burden of proof under 7.44(3) on the issue of whether the business judgment rule applies to a board determination to dismiss a derivative action. The shareholder/plaintiff bears the burden of proof either (1) that the majority of the board is not independent [i.e. the old demand excused test is applied after the demand required under the Act in all cases], or (2) that the corporate decision to terminate is not entitled to the protection of the business judgment rule [i.e. the traditional business judgment rule is applied as articulated in *Auerbach* ].

Since section 7.42 requires a demand in all cases, the distinction between demand excused and demand required cases does not apply. However, sections 7.44(d) and 7.44(c) carry forward the distinction by establishing pleading rules and allocating the burden of proof depending on whether there is a majority of independent directors. If there is no independent majority, the burden is on the corporation to establish that the requirements of section 7.44(a) [the business judgment rule] have been met. If there is an independent majority, the burden remains with the plaintiff on these issues and the court will apply the standard customarily used in reviewing the business judgment of independent directors. The burden on the threshold question of whether a majority of the board is or

is not independent rests with the plaintiff under normal burden of proof standards.

Section 7.44. Dismissal, "Changes in Model Business Corporation Act—Amendments Pertaining to Derivative Proceedings", 44 Bus.Law. at 553 (footnote omitted). The Act leaves it to the court to determine the independence of the majority of the board. In considering the issue of independence, the Act follows the case law development on this issue.

(c) None of the following shall by itself cause a director to be considered not independent for purposes of this section:

(1) the nomination or election of the director by persons who are defendants in the derivative proceeding or against whom action is demanded;

(2) the naming of the director as a defendant in the derivative proceeding or as a person against whom action is demanded; or

(3) the approval by the director of the act being challenged in the derivative proceeding or demand if the act resulted in no personal benefit to the director.

Section 7.44 Dismissal, *supra,* at 550.

**33.** *See, e.g.,* Block, Barton and Radin, *The Business Judgment Rule* (Prentice Hall 1987) at 241:

The [*Zapata* ] two-step test, however, applies only where demand is excused; where demand is required and refused, the directors' decision "will be respected unless it was wrongful"—*i.e.,* the business judgment rule will apply.

See also Block & Prussin, *supra,* 39 Bus.Law. 1503 (1984):

In *Zapata* the court held that the two-step test is to apply only in "demand-excused" cases ... In cases where demand is required and is refused, under *Zapata* the two-step test does not apply, and the directors' decision ... will be respected so long as it satisfies the standards of the business judgment rule.

*Id.,* at 1505.

[U]nder *Zapata* where demand is required and has been refused by the corporation, the directors' decision not to pursue the case will be respected unless it was "wrongful."

*Id.,* at 1508.

■ While Michigan courts may apply *Zapata*'s burden-shifting and strict scrutiny test to a demand excused case, I believe that the Michigan Supreme Court would not adopt *Zapata* in a demand required case. The Michigan Supreme Court would apply the standards of *Auerbach v. Bennett, supra,* to review a corporate defendant's motion to terminate in a demand required case.[34] For this reason, I find that in reviewing Consumers' present motion to terminate, this Court should accord the decision of the board of directors the presumption of the business judgment rule unless plaintiffs carry their burden of challenging "the disinterested independence of the members [deciding against pursuing this action or] the appropriateness and sufficiency of the investigative procedures chosen and pursued...." *Auerbach,* 47 N.Y.2d at 623–24, 419 N.Y.S.2d at 922, 393 N.E.2d at 996, or the board's "good faith." *Genzer, supra,* at 693.[35]

**34.** One of the reasons corporations select outside independent directors is to improve stockholder and public confidence that the corporate management is held to account by review of distinguished individuals whose success, wealth, prestige, and integrity are not dependent on, nor likely to be sacrificed for the corporation. The added expense to the corporation, the added work made necessary for management to communicate with such outside persons who are less familiar with the day-to-day corporate operations, and the added likelihood that independent directors will disagree with management are worth it for the enhanced credibility such directors bring to the corporation. They are *particularly important* if these outside directors can serve on special investigative and evaluative committee, such as special litigation committees, where their independent status can help validate the legitimacy of difficult and challenged decisions. Where demand is required, and the board deals with the demand through such independent directors as advisors or ultimate leaders, if courts were to apply a *shifted* burden *of proof on the availability of the* business judgment rule and a heightened *Zapata*-type review of the merits of their decision, corporations would have a lesser incentive to use such independent directors for such purposes, and less incentive, indeed, even to have distinguished outside directors at all. Why should management go to the additional trouble of dealing with outside directors if they will still be reviewed by courts on the merits of their ultimate business decision.

This argument is elaborated under the economic theory of agency costs in *Dooley and*

## III. THE SUMMARY JUDGMENT STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable fact-finder could find only for the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress and Company,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). *See also Lenz v. Erdmann Corp.,* 773 F.2d 62 (6th Cir.1985). This summary judgment "burden" on the moving party does not affect the issue of who has the ultimate burden of proof. While in resolving a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party,[36] the Supreme Court

*Veasey, supra,* 44 Bus.Law. at 524–34, where they note that such "bonding" cost to the corporation of having independent directors can lower the "agency costs" of a firm as well as, and in many cases better than, the "monitoring costs" of stockholders' using derivative action.

As noted by Judge Easterbrook in *Starrels, supra,* 870 F.2d at 1174, "[i]f courts would not respect the directors' decision not to file suit [when a stockholder demand is made], then demand would be an empty formality." If all decisions not to pursue derivative litigation by a corporation are to be reviewed on the merits by courts, we have shifted the managerial authority from the corporate board to the courts. If the quest for independent review is always to involve judicial review of the merits, corporations will be less inclined to use independent directors to review stockholders' demands.

**35.** As discussed in notes 27 & 32, *supra,* the Proposed Amendments to the Model Business Corporation Act, Section 7.44(e), places the burden of proof on the shareholders either to show that (a) a majority of the directors are not disinterested and, if they cannot show that, to show (b) that the board's rejection of the demand and decision to terminate the derivative litigation was not "done in good faith after conducting a reasonable inquiry upon which its conclusions are based."

**36.** *See Duchon v. Cajon Co.,* 791 F.2d 43, 46 (6th Cir.1986); *Bouldis v. Suzuki Motor Co.,* 711 F.2d 1319 (6th Cir.1983); *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

noted in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Id.* at 322–23, 106 S.Ct. at 2552.

Thus, in the present case, defendants on summary judgment have the "burden of showing the absence of a genuine issue as to any material fact," and that based on the evidence viewed most favorably to the plaintiff, no reasonable fact-finder could deny the Consumers Advisory Committee and board the protections of the business judgment rule for their decision to reject plaintiffs' demand and to terminate this litigation. Under *Celotex*, since plaintiffs' carry the ultimate burden of proof under Rule 23.1 to demonstrate the board's demand refusal was wrongful, plaintiffs must demonstrate sufficient evidence from which a reasonable fact-finder could conclude the board's decision to reject the demand was not the product of disinterested, independent directors based in good faith on a thorough investigation.

## IV. UNDISPUTED FACTS

While a special litigation committee was not required to make the decision in this case since demand on the board was not excused as futile, the Consumers' board of directors nonetheless formed an independent Advisory Committee of directors on September 3, 1986. The only direction to the Advisory Committee was that it report to the board by November "as to whether the assertion of the claims described in the [demand] letter would be in the best interest of the Company, together with a summary of the reasons for the conclusion, and a statement of the recommended action to be taken by the Board." That committee was made up of the following individuals: William T. McCormick, Jr., Chairman of the Board and Chief Executive Officer of Consumers Power; Thomas F. Russell, Chairman and Chief Executive Officer of Federal Mogul Corporation; Robert D. Tuttle, Chairman and Chief Executive Officer of Sealed Power Corporation; and Dr. John M. Deutch, Provost of Massachusetts Institute of Technology and former Undersecretary of the U.S. Department of Energy. All of these directors joined the board after the alleged wrongful acts of the officers and directors who are defendants.

William McCormick left his Chairman and C.E.O. positions at American Natural Resources to take over at Consumers Power on November 1, 1985. This was after the plaintiffs' filing of their earlier derivative action in this case on August 13, 1984.

The committee met on three occasions. On September 3, 1986, it selected Thomas Russell as Chairman and Thomas McNish, Corporate Secretary of Consumers, as Secretary. The Advisory Committee chose the law firm of Barris, Sott, Denn and Driker, as its counsel with Eugene Driker lead counsel for the Advisory Committee. After this September 3 meeting, the committee sought information concerning the impact on Consumers' financial, regulatory, and legal affairs if Consumers were to prosecute the claims against its officers and directors as demanded by the plaintiffs. The committee sought and obtained reports from:

> Consumers' Vice–President and General Attorney concerning rate proceedings before the Public Service Commission.
>
> The company's chief financial officer concerning financial and business plans of the company.
>
> The law firm of Honigman, Miller, Schwartz, and Cohn ("HMS & C") con-

cerning the securities class actions pending against Consumers as well as a pending investigation by the Securities and Exchange Commission, which was later terminated with no action; and

The law firm of Barris, Sott, Denn and Driker ("BSD & D") concerning the *Dow v. Consumers Power* litigation in Midland County and the prospective litigation and/or negotiations of Consumers Power with the Bechtel Power Corporation relating to the construction of the Midland Nuclear Power Plant.

These reports were received by the committee on or before October 10, 1986, and circulated to each member of the committee. The committee, having reviewed these reports, met on Saturday, October 18, 1986, to discuss the written reports, to hear oral reports and to make inquiries of the authors of those reports, and to determine its recommendation to the full board. By the end of that meeting, the committee unanimously decided that it would not be in the best interest of Consumers Power to assert the claims contained in the plaintiffs' derivative complaint against its officers and directors. The committee directed Mr. Driker to prepare a report summarizing the deliberations, conclusions, and recommendation of the committee for submission to the board of directors.

Mr. Driker prepared the report and it was circulated to the committee for comments. The report was thereafter revised in light of those comments, and a final report was presented to the special Advisory Committee at its third meeting on November 5, 1986. It was the unanimous sense of the Advisory Committee that even if the company were entirely successful in pursuing the claims against its officers and directors which the plaintiffs sought in the derivative complaint, the benefits that might be gained from such a successful lawsuit were far outweighed by the negative impact to the company. The Advisory Committee concluded that Consumers' pursuit of the derivative action would be detrimental to multiple other activities and negotiations that were proceeding. These included Consumers' rate case, the Dow litigation, efforts to join into a new partner-

ship with Dow to convert the nuclear plant to a non-nuclear form of generating energy, its negotiation and potential litigation stance with Bechtel, its class action defense against various purchasers of Consumers' stock pending in this Court, and the investigation of the Securities and Exchange Commission. The committee believed that Consumers Power should pursue a path that would serve the maximum overall benefit of the corporation and all of its shareholders. It concluded that presentation of the derivative claims would not be in the company's best interest. At the November 5, 1986, meeting, the Advisory Committee unanimously resolved that the full board of directors accept its report and deny the requests contained in the August 15, 1986, demand letter from counsel for the derivative plaintiffs.

The report and recommendations of the Advisory Committee were thereafter presented to the full board on November 5, 1986, at which time the board voted unanimously to reject the plaintiffs' demand.

## V. PLAINTIFFS' ASSERTIONS REGARDING THE WRONGFULNESS OF THE BOARD'S DECISION REJECTING THEIR DEMAND

### A. *Plaintiffs' General Allegations*

In summary, plaintiffs' assertion that the demand rejection was wrongful is based on claims that the Advisory Committee failed to make an informed business judgment: (1) by relying too extensively on biased opinions of attorneys who were tainted by conflicts of interest; and (2) by lack of thoroughness in failing to consider the merits of plaintiffs' claims or to undertake a damage study, and by failing to consider an alternate corporate response of "neutrality" to plaintiffs' demand.

Plaintiffs question the sufficiency of the process and the good faith of the board, claiming that:

[T]he process followed by the Board was perverted by the Advisory Committee's extensive reliance on two law firms that had serious conflicts of interest. As will be shown, the two firms' paramount in-

terest was in preventing the institution of the derivative action.

Plaintiffs' Brief in Opposition to Defendants' Motion to Terminate (hereinafter "Plaintiffs' Brief") at 1. Plaintiffs argue further that under the biased guidance of its counsel, the Advisory Committee performed a minimal and cursory investigation that avoided review of the merits of the derivative claims against the defendant directors. Plaintiffs' Brief at 7–8. It did not consider input critical of Consumers from the Michigan Attorney General or others. Finally, if Consumers feared undercutting its litigation position in the *Dow* and securities class action cases, and its business position in dealing with the Public Service Commission, Bechtel and investors, it is alleged that the Advisory Committee failed to consider the impact on these areas of concern of choosing not to actively pursue the derivative claims, but to remain "neutral" and allow the derivative plaintiffs to prosecute the suit. Plaintiffs' Brief at 11.

### 1. Plaintiffs' Claims of Conflict of Interest

#### (a) The Honigman, Miller, Schwartz & Cohn Conflict

HMS & C is counsel for the individual director defendants in the present and prior stockholders' derivative suit. They are also counsel for both the individual directors and Consumers Power in the securities class action. HMS & C also represented Consumers in the S.E.C. investigation related to the problems flowing from the Midland nuclear power plant. HMS & C time records from August through November 1986, show that, from the time the demand letter was received, Cyril Moscow and various members of the Honigman firm provided over 100 hours of legal services on behalf of Consumers Power related to Consumers' response to the demand letter. Cyril Moscow consulted with Eugene Driker as well as with Chairman McCormick and General Counsel, Lawrence B. Lindemer, of Consumers Power.[37]

Plaintiffs assert that to allow the Honigman firm such "intimate involvement in each aspect of the Board's action, beginning the moment the demand was received," was "highly improper" since the Honigman firm had an interest in protecting the individual officers and directors who were their clients in the derivative action.[38]

Plaintiffs argue that the information obtained from the Honigman firm was not merely factual but also included their legal opinion as to the consequences of acquiescing to the stockholder demand letter upon the SEC investigation and the securities fraud case against Consumers Power. Plaintiffs argue that there was no voice of concern raised by committee members or the committee's counsel that the Honigman firm's opinion might be prejudiced and thus improperly influence the Advisory Committee. Specifically, they challenge Mr. Moscow's deposition testimony that, in forming his opinion about the impact of the derivative action on other Consumers' legal matters being handled by HMS & C, Moscow did not consider his professional interest in not having his other clients, the directors, sued.[39]

---

**37.** On September 3, 1986, Cyril Moscow of HMS & C met with Eugene Driker before the board meeting that created the special Advisory Committee. Mark Stern spent substantial time in assisting in the drafting of the HMS & C report to be presented to the Advisory Committee on the class action securities case and the SEC investigation. James K. Robinson and Ronald Longhoffer also consulted on the HMS & C report to the special Advisory Committee. Mr. Moscow met with Mr. Driker before finalizing the HMS & C report. On October 18, 1986, Mr. Moscow attended a meeting with the Advisory Committee, accompanied by Mr. Longhoffer. Following this Advisory Committee meeting, Mr. Moscow and his colleagues reviewed the Advisory Committee Report prepared by BSD & D and discussed it with Sharon Woods of BSD & D. Mr. Moscow attended a second Advisory Committee meeting in Jackson, Michigan, on November 5, 1986, and again consulted with Eugene Driker.

**38.** At his deposition, Mr. Moscow admitted:

It's been our professional duty to help the clients and attempt to have the claims dismissed or otherwise disposed of without loss to the clients, yes.

Moscow deposition at 12–13.

**39.** Mr. Moscow stated in his deposition that prior to reaching his conclusion he did not consider any issues of his professional responsi-

### (b) Plaintiffs' Claims Regarding the Barris, Sott, Denn and Driker Conflict

Plaintiffs also contend that Eugene Driker of the Barris, Sott, Denn and Driker law firm had a serious conflict of interest. Plaintiffs' Brief at 6–7. They note that Mr. Driker was chief trial counsel for Consumers in the Dow Chemical litigation in Midland County Circuit Court, where Mr. Driker for three years had defended Consumers on identical claims of mismanagement by its officers and directors in connection with the construction of the Midland power plant. Mr. Driker acknowledged in his deposition that he had undertaken a vigorous defense against the charges of mismanagement in the Dow litigation (Driker deposition at 71–72). Plaintiffs' counsel argues that the derivative claims against the individual defendants were contrary to the public litigation position Mr. Driker had taken in the *Dow* case. Finally, plaintiffs assert that Mr. Driker's inability to act objectively was evidenced by his total involvement and frequent consultation with the Honigman firm throughout the entire process.

### 2. Plaintiffs' Claims Regarding the Thoroughness of the Advisory Committee's Inquiry

### (a) Defendants' Alleged Failure to Consider the Merits or Other Potential Damages

Plaintiffs have asserted that the investigation and analysis of the Advisory Committee was inadequate because it did not review the merits of the derivative claims against the directors. They also fault the committee for not requiring that a damage study be undertaken in the securities case instead of relying on press reports for damage estimates. They also criticize the Advisory Committee's considering pro-

management reports on the merits of the claims against the directors, prepared by Consumers' inhouse counsel, while ignoring an Attorney General report asserting mismanagement and imprudence by these same directors. Plaintiffs argue that a balanced approach would have required consideration of both positions.

They accuse BSD & D and HMS & C of devising an "ingenious solution" "to cover up the obvious flaw of ignoring the merits in their investigation." Plaintiffs' Brief at 8.

> They advised the committee that even if one were to accept plaintiffs' allegations as true, permitting Consumers to prosecute the derivative claims would undermine the litigation strategy being utilized by the attorneys representing Consumers in three pending proceedings; the Dow case, the class action and the rate proceeding.

*Id.* Plaintiffs contend that in analyzing these three cases, the committee only considered Mr. Driker's input regarding the *Dow* case, Mr. Moscow's opinion regarding the securities class action, and Mr. Mikelonis' views regarding the rate case. Plaintiffs argue that each of these individuals was committed to a litigation strategy of vigorously defending Consumers' prior management from charges of imprudence and mismanagement. "Predictably, each attorney issued a report bemoaning the fate awaiting Consumers if it were to prosecute the derivative claims." Plaintiffs' Brief at 9. The committee considered that the maximum amount of recovery was slightly in excess of fifty million ($50,000,-000) dollars, which was the extent of the Directors and Officers Insurance Policy. Plaintiffs argue:

bility to the individual defendants whom his firm represented in both the securities class action and in plaintiffs' earlier derivative suit. He acknowledged that before reaching his conclusion as to the impact of the derivative action on the securities class action and S.E.C. investigation, he did not determine whether he would be professionally able to come to the opposite conclusion: that the derivative suit *would* be in the best interest of Consumers Power. He

thought about the questions put to him by the Advisory Committee and answered them. If he had reached the opposite conclusion, Mr. Moscow acknowledged that he would have had to face the conflict between the interests of the individual directors, represented by HMS & C in the derivative action and securities class action, and those of Consumers Power, represented by HMS & C in the securities class action and S.E.C. investigation.

The lawyers counseling the Advisory Committee failed to consider the incongruity of their reasoning, however, that if the allegations of mismanagement contained in the derivative complaint are assumed to be true, then Consumers' position to the contrary in each of the aforementioned proceedings would be totally baseless. Therefore, it must be assumed that the able counsel representing Consumers' adversaries in each of those proceedings would ultimately succeed. In effect, if one assumes the plaintiffs' allegations are true, then the Advisory Committee unwittingly sacrificed a potential recovery in excess of $50,000,000 solely to preserve a doomed litigation strategy. What could be better proof of the sophistry of the lawyers' reasoning? What could be more indicative of careless and superficial investigation?

Plaintiffs' Brief at 9–10.

### (b) Plaintiffs' Claims Regarding Defendants' Failure to Consider the Option of Remaining "Neutral"

Plaintiffs note specifically that no attorney considered the possibility of the impact on each of the respective litigation positions "if the derivative plaintiffs were permitted to prosecute the claims, with Consumers remaining neutral." Because part of the concern of the Consumers' Advisory Committee was that statements made by Consumers in the complaint against its officers and directors would be deemed party "admissions" in other litigation or the rate proceedings, plaintiffs suggest that a "neutral" position would have avoided Consumers' having admitted anything that could be used against it. Consumers could merely have allowed the stockholders to prosecute the derivative claim without Consumers taking a position.

### VI. ANALYSIS

#### A. The Conflict of Interest Claims

■ Initially, it should be noted that in response to the defendant's motion to dismiss, the plaintiffs assert no facts to suggest that any of the four members of the Advisory Committee had any interest or disqualifying bias that would render the board's decision "wrongful." There is no evidence that the members of the committee had any prior business or personal relationship with any of the defendants that would be sufficient to render the committee member interested or not independent. Thus a traditional attack on the special committee's neutrality is not asserted in this case. Rather, plaintiffs argue that the committee in its investigation and ultimate decision relied too extensively on biased information from the attorneys who had previously defended the corporation and individual defendants over similar claims of mismanagement and other wrongdoing.

Plaintiffs are correct in their statement of the legal proposition that even if none of the individual members of a special litigation committee is found to have a disqualifying interest or bias, the integrity of a special litigation committee can be undermined if the attorneys representing and advising it have a sufficient conflict of interest to taint the committee's investigation and decision-making. Yet, as noted below, the facts of this case do not support the plaintiff's theory of why the Consumers' rejection of the demand was wrongful.

#### 1. The Applicable Conflict of Interest Standards

At the time of the demand and its refusal, the lawyers involved in this case were governed by the Michigan Code of Professional Responsibility. Under the Code of Professional Responsibility and the more recent Michigan Model Rules of Professional Conduct that replaced it, an attorney cannot represent a client if helping that client will hurt another client or if the lawyer's zeal and independent professional judgment for that client will be diluted by the lawyer's commitment to another client, any third party, or the lawyer's own personal interest.[40]

---

**40.** The specific rule dealing with conflict of interest is DR 5–105 which provides:

DR 5–105 **Refusing to Accept or Continue Employment if the Interests of Another**

A lawyer who represents a corporation owes his allegiance to that entity and not to the individual directors or officers.[41]

### Client May Impair the Independent Professional Judgment of the Lawyer.

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(D) If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner or associate, or any other lawyer affiliated with him or his firm may accept or continue such employment.

(footnotes omitted). DR 5–101(A) states as follows:

(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial business, property, or personal interests.

(footnote omitted).

On October 1, 1988, the Michigan Rules of Professional Conduct replaced the Model Code. With respect to the conflicts rules, the new Michigan Rules are virtually identical, albeit a bit more precise.

### Rule 1.7 Conflict of Interest: General Rule

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Ethical Considerations accompanied the 1969 A.B.A. Model Code of Professional Responsibility setting out precatory standards of lawyer behavior. While the Michigan Supreme Court did not specifically adopt the A.B.A. Ethical Considerations, Michigan courts have consistently looked to them in determining questions of legal ethics. Ethical Consideration 5–14 notes in part:

Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client.

Ethical Consideration 5–15 states in part:

If a lawyer is requested to [represent] ... clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing multiple clients with potentially differing interests.

Ethical Consideration 5–16 notes in part:

In those instances in which a lawyer is justified in representing two or more clients having differing interests, it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires. Thus before a lawyer may represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent. If there are present other circumstances that might cause any of the multiple clients to question the undivided loyalty of the lawyer, he should also advise all of the clients of those circumstances.

(footnotes omitted.) Similarly, EC 5–21 notes:

The obligation of a lawyer to exercise professional judgment solely on behalf of his client requires that he disregard the desires of others that might impair his free judgment. The desires of a third person will seldom adversely affect a lawyer unless that person is in a position to exert strong economic, political, or social pressures upon the lawyer.

41. The A.B.A. Model Code of Professional Responsibility, EC 5–18, states as follows:

A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other

If representation of multiple interests makes it likely that the lawyer's independent professional judgment would be affected or that he might be involved in representing different interests, such lawyer cannot even ask for consent of the clients unless "it is obvious that he can adequately represent the interest of each." Only if this is condition is met can the attorney seek the consent of the clients "after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." [42] Each client must consent to the dual representation. If a corporation consents to a lawyer representing both it and an officer or director, "the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders." [43] The new A.B.A. Model Rules have comments clarifying why in most derivative actions involving "serious charges of wrongdoing by those in control of the organization" a conflict will exist precluding dual representation.[44]

### 2. General Analysis of Whether the Advisory Committee was Tainted by Conflicts of Interest of Either Honigman, Miller, Schwartz & Cohn or Barris, Sott, Denn & Driker

#### (a) The Barris, Sott, Denn & Driker Firm

The primary conflict of interest issue that might have affected the deliberations of the Advisory Committee would relate to the law firm of Barris, Sott, Denn & Driker, since they were selected as counsel to advise the Advisory Committee. BSD & D, and Eugene Driker and Sharon Woods particularly, had devoted over three years to the *Dow Chemical* litigation, defending Consumers against similar allegations of mismanagement and deception by its officers and directors as are involved in this derivative action. Yet BSD & D's client in the *Dow* case, in the present case, and in their representation of the Advisory Committee is one and the same—Consumers Power. The BSD & D firm only represents Consumers Power. It does not represent any of the individual director defendants in the present case or any other matters. These individual defendants are represented by Honigman, Miller, Schwartz & Cohn.

---

person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization. Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him in an individual capacity; in such case, the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present.

Michigan Rule 1.13 states as follows:

Rule 1.13 **Organization as Client**

(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

(b) If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in actions, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to pro-

ceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization....

Model Rule 1.13 then sets out possible steps a lawyer could take.

**42.** DR 5–105(C), set forth at note 40, *supra.*

**43.** MR 1.13(e).

**44.** M.R. 1.13, **Comment. Derivative Actions.** Although the Michigan Rules are largely an adoption of the A.B.A. Model Rules, the Michigan Court did not specifically adopt the A.B.A. Comments. Given the Restatement format of the A.B.A. Model Rules, it is likely the new Michigan Rules will be interpreted by Michigan Courts in light of the Comments to the A.B.A. Rules.

As corporate counsel, BSD & D's allegiance is to the corporate entity, not to its individual officers and directors. In serving as counsel to the Advisory Committee, BSD & D was professionally obliged under the then applicable DR 7–101(A)(1) and (3)

to seek the lawful objectives of their client through reasonably available means and to take no intentional action that would "prejudice or damage" Consumers Power during the course of the professional relationship unless the lawyer believes the client has committed fraud on a tribunal.[45]

**45.** DR 7–101 **Representing a Client Zealously.**
(A) A lawyer shall not intentionally:
(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules,....

\*    \*    \*    ·\*    \*    \*

(3) Prejudice or damage his client during the course of the professional relationship except as required under DR 7–102(B).
DR 7–102(B), as adopted in Michigan, requires a lawyer who has information clearly establishing his client has committed a fraud during the course of the lawyer-client relationship to call upon the client to rectify the fraud and, if the client refuses, requires that the attorney "reveal the fraud to the affected person or tribunal." This obligation exists for Michigan lawyers even if the lawyer learns of the fraud from confidential information. Michigan has one of the strictest disclosure obligations for fraud of a client committed during the course of representation. Michigan did not adopt the 1974 proposal of the American Bar Association to add a proviso to DR 7–102(B) that exempted from disclosure "privileged" information. (This term "privileged" was later interpreted by ABA Formal Opinion 301 to mean confidential information, thus correcting the ABA's drafting error that confused the narrower rules of evidence with the broader protections of confidentiality imposed by rules of professional responsibility.)
Thus, if at any time during the *Dow* litigation Mr. Driker obtained information from Consumers' employees, directors, or others establishing that any position or discovery response given in the *Dow* case was based on knowingly misstated facts, Mr. Driker would have been professionally required under DR 7–102(B) to make a disclosure if his client failed to correct the misstatement.
In the *Dow* litigation, BSD & D was also constrained by various other professional obligations. DR 7–102(A)(2) precludes an attorney from knowingly advancing a claim or defense that is unwarranted under existing law. DR 7–102(A) precludes an attorney from advancing unwarranted claims and from making false statements of law or fact. DR 7–102(A)(7), as well as DR 1–102(A)(4) and (5), would preclude an attorney from engaging in fraudulent or dishonest acts or in conduct prejudicial to the administration of justice. These professional obligations would preclude Eugene Driker from putting on a defense in the *Dow* case that he knew was not well grounded in fact or supported by existing law. Even if an attorney commences a defense believing it to be well

grounded and later discovers it is based on false information, Michigan DR 7–102(B)(1), as noted above, would require that attorney to disclose the information if his client did not. DR 2–110(B)(2) would require an attorney to withdraw if continued representation would require advancing a claim that is not well grounded in fact. While the Rules of Professional Conduct do not require an attorney to "vouch" for his client, they permit a lawyer to advocate a client's case even if he is uncertain about the truthfulness of the client's position, so long as he doesn't actually "know" that the client's position is false. Again, when a lawyer represents a corporation, he represents the entity and not the individual directors and officers. Accordingly, if Mr. Driker had doubts about the credibility of any of the officers, directors, or other employees in the *Dow* litigation, he would have been obliged to share an analysis of these vulnerabilities with his client as part of his professional obligation to provide his client with competent advice. The new Model Rules make it clear that if a lawyer knows an officer or employee for the corporation has undertaken a wrongful act, or intends to act in a way that violates a legal obligation to the corporation or of law that could be imputed to the organization and is likely to result in substantial injury, the lawyer is required to act in the best interest of the corporation, including referral of the matter, if necessary, to the board of directors. Michigan Rule 1.13(b). *See* n. 48, *supra.*
Thus, under the rules of professional responsibility in Michigan, Mr. Driker in representing Consumers Power in the *Dow* case could not put on a defense that he knew to be false. He would be required to discuss vulnerabilities in this case with the appropriate corporate representative, which in this case might have included not only the General Counsel, Lawrence Lindemer, but also the new C.E.O. and Board Chairman, Charles McCormick. Similarly, in representing the Advisory Committee, Mr. Driker's professional obligation was solely to the corporate entity. Thus, had the Advisory Committee considered an evaluation of the merits of the claims against the individual officers and directors, Mr. Driker would have been professionally obliged to give his candid opinion notwithstanding the consequences for individual directors or officers.
There is not a hint of evidence in the present record to suggest that Mr. Driker had any information that would have created such a professional dilemma in the *Dow* case. I mention these strict professional rules only to demonstrate that a litigator is not merely a "hired knife thrower" but must act as an officer of the

While plaintiffs assert that Eugene Driker's vigorous defense against claims of director mismanagement in the *Dow* case precluded him from giving unbiased advice to the Advisory Committee or adequately representing the committee, the committee determined not to consider the merits of the case, but rather only the effect of the derivative action on the position of Consumers in the *Dow* case and other matters. Thus, even if Eugene Driker had an inappropriate bias in favor of the individual directors, the fact that the committee chose to presume the legitimacy of the merits of the claims against the directors blunted any effect such a bias would have.

While plaintiffs have asserted that the bias of Eugene Driker and his firm have tainted the Advisory Committee, they have not presented the court a scintilla of factual evidence suggesting that Mr. Driker or anyone in his firm has, in the handling of the *Dow* case or in the representation of the Advisory Committee, violated any professional obligation to the client. Plaintiffs in their brief acknowledge that the members of the Advisory Committee were aware of the other professional involvements of both BSD & D and HMS & C.

As counsel to the Advisory Committee, Mr. Driker was called upon to give an opinion of the impact on the *Dow* litigation of pursuing the derivative action against the individual defendants. As plaintiffs note, Mr. Driker responded that if Consumers filed a complaint against its directors for wrongdoing, this complaint would be deemed to be an admission in the *Dow* case of the very claims Consumers had denied in that case. Plaintiffs' Brief at 11. While Mr. Driker may have been biased in favor of defending his client, Consumers Power, in the *Dow* litigation, it comes as little surprise—and can hardly be said to be a product infected by bias—to say that Consumers would be harmed in the *Dow* litigation by doing a complete about-face in pursuing a claim of fraud and mismanagement against its officers and directors.

While Mr. Driker, like many litigators in the white heat of an extended trial, may have developed an "adversarial squint" favoring Consumers' management, any such bias would, at most, affect his advice to the Advisory Committee in an analysis of the merits of the case. Yet, as noted above, Mr. Driker was not called upon to give the Advisory Committee any input on the merits of the claims against the individual director defendants. The Advisory Committee avoided an analysis of the merits of the case by adopting the working assumption that such a suit could be successful, and then considering whether it should be brought in light of Consumers Power's other multiple involvements.

While plaintiffs' position opposing the motion to terminate challenges the fairness and professional integrity of Eugene Driker, they point to no facts that would suggest that at any time he abandoned his loyalty and commitment to serving the interest of his sole client, Consumers Power. There is nothing in the record that would even hint that Mr. Driker did anything inconsistent with his professional obligation of presenting a *bona fide* defense in the *Dow* litigation.

While plaintiffs' counsel assert that Mr. Driker's public posture as counsel in the *Dow* case and his consulting with HMS & C render his advice nonobjective, plaintiffs present no facts that would demonstrate that Eugene Driker gave biased or inaccurate advice to the Advisory Committee. Neither the fact that plaintiffs' counsel disagrees with Mr. Driker's opinions nor plaintiffs' unsupported accusations attacking the professionalism of one of BSD & D's named partners are sufficient evidence from which a reasonable fact-finder could conclude BSD & D had a disabling conflict that tainted the Advisory Committee.

### (b) Honigman, Miller, Schwartz and Cohn

It is true that the HMS & C firm could not serve as counsel to the Advisory Com-

court to assure his client's defense is well grounded in law and fact. Absent a showing of facts to the contrary, this Court should assume

that BSD & D, and Mr. Driker, complied with the oath of admission to the State Bar of Michigan.

mittee since they represent the defendant directors in this derivative action. The inquiry and recommendation of the Advisory Committee could have had an effect directly adverse to these HMS & C clients. But HMS & C did not represent the Advisory Committee, and the potential conflict for HMS & C would not preclude the Advisory Committee or its counsel from consulting HMS & C, even regarding the merits of the derivative claims against HMS & C director clients. Indeed, in the most hostile of adversarial litigation, counsel commonly consult with the opposing counsel about the merits of the case and relay these discussions to their clients. Yet here, HMS & C was not consulted about the merits of the derivative claim against the directors, but rather about its effect on the securities class action litigation and the S.E.C. investigation of Consumers. On the class action and S.E.C. matters, HMS & C represented Consumers. While HMS & C also represented the individual directors in the securities class action case, plaintiffs' counsel presents no facts that would suggest that HMS & C failed to act appropriately in that case in analyzing the potential conflicts, consulting with both the individual directors and the corporation, and obtaining the necessary consents to the joint representation.[46] Even if plaintiffs' counsel had facts that would demonstrate an actual conflict of HMS & C's dual representation in the securities case, this would not affect the decision of the Advisory Committee because the committee was represented in the demand evaluation by separate counsel, BSD & D, which could act as a filter and independent advisor of the Special Committee. Nor has plaintiffs' counsel presented any facts to suggest that the opinion of

HMS & C was incorrect. Again, it is hardly a surprise to conclude that if Consumers changed its defense postures in the securities class action and S.E.C. investigation and sued its directors in a derivative action, this metanoia would harm Consumers' position in the class action and S.E.C. matters. The fact that Cyril Moscow's conclusion to this effect avoided HMS & C's potential conflict dilemma with its director clients does not undermine Mr. Moscow's opinion, nor does it taint the Advisory Committee's consideration of Mr. Moscow's opinion in their final decision.

While Messrs. Moscow and Longhoffer of HMS & C attended the Advisory Committee meeting of October 18, 1986, to respond to questions about their written report to the Advisory Committee, and Mr. Moscow attended the November 5, 1986, meeting, plaintiffs' counsel presents no evidence that HMS & C attorneys participated in or were even present during the final Advisory Committee deliberations on whether it was in Consumers' best interest to pursue the derivative litigation against its directors.

3. Analysis of BSD & D and HMS & C Conduct Under Plaintiffs' Case Authority on Conflicts of Interest

Plaintiffs cite several cases dealing with conflicts of interest but point the court to no case that would be applicable to the position of Mr. Driker or members of his firm. Most of the cases advanced suggest that in a derivative action, at least after the preliminary stages and for those involving alleged breaches of the duty of loyalty, that the same attorney cannot represent the corporation entity and the individual officers and director defendants.[47] These

---

**46.** For a discussion of the necessary consents, *see* notes 40 & 41, *supra.*

**47.** *Cannon v. U.S. Acoustics Corporation,* 398 F.Supp. 209 (N.D.Ill.1975), holds that the same law firm cannot represent a corporation and individual director-defendants in a derivative action which alleges that the individual defendants impermissibly issued themselves illegal stock options and stock based on fraudulent representations that it was for service, rent, and other expenses. 398 F.Supp. at 214.

*Messing v. FDI, Inc.,* 439 F.Supp. 776 (D.N.J. 1977), involved a derivative action charging certain of the inside directors in a merger with having committed fraud which resulted in their being overcompensated for certain stock they owned in the acquired corporation. The outside directors were charged with negligence in connection with this merger. The same counsel initially represented the corporation, two of the outside directors, and all of the inside directors. *Messing* notes that certain courts have allowed directors in the corporation to be represented by the same counsel in cases that do not involve

cases make clear the reasons why HMS & C represents the individual directors in this derivative action while BSD & D represents the corporation. They also demonstrate why HMS & C could not have represented the Advisory Committee in considering plaintiff's demand. But because the Advisory Committee was represented by BSD & D and not HMS & C, these cases do not demonstrate any conflict that tainted the Advisory Committee's activities.

Plaintiffs also cite *Yablonski v. United Mine Workers*, 448 F.2d 1175 (D.C.Cir. 1971), in support of their conflicts argument against Eugene Driker's representation of the Advisory Committee. *Yablonski* involved a rather famous effort of Joseph A. Yablonski and other union members to wrest control of the United Mine Workers of America from its President, Tony Boyle. That action was under § 501 of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 501(b). It sought an account of UMWA funds and restitution of funds allegedly misappropriated and misspent. While not a derivative action, were it one it would clearly be a breach of loyalty claim. The outside corporate counsel for UMWA initially entered an appearance for both the corporation and for its individual officer-defendants. Thereafter it withdrew as counsel for the individual defendants but continued representing UMWA. While the lower court found this acceptable, the D.C. Circuit found it objectionable. The court noted that UMWA counsel, while no longer representing the individual defendants in the § 501 case, was representing them in four other litigations brought against the UMWA and the individual officers and directors. These four separate law suits were brought by Joseph Yablonski and others, claiming that the officers and directors misused their union positions for their own benefit to secure Boyle's re-election and to retaliate against Yablonski for his running for union president. Thus, while counsel for UMWA no longer represented the individual defendants in the *Yablonski* § 501 case, he did continue to represent them in substantially similar litigation. The D.C. Circuit found that under the appropriate rules of professional responsibility:

[S]uch counsel could not undertake action on behalf of [UMWA] which would

"any allegations of breach of confidence or trust" or fraud. 439 F.Supp. at 781. Yet, *Messing* nonetheless found that irrespective of the allegations against the director, be it fraud or negligence, the interests of the two will almost always be diverse. 439 F.Supp. at 782. *Messing* required the corporation to retain an independent counsel other than the attorney who represented the individual defendants.

*Elberta Oil Co. v. Superior Court in and for Kings County*, 108 Cal.App. 344, 291 P. 668 (Cal. Dist.Ct.App.1930), involved directors alleged to have used insider knowledge to acquire rights in a property adjacent to a recent oil find of the company. In *Elberta*, the same attorney filed an answer for the corporation, its officers and directors. He also filed a suit to quiet title regarding the real property and leaseholds on behalf of one of the defendants. That suit necessarily named the corporation. Thus the lawyer was found to have a conflict by representing an individual in a quiet title suit against a corporation that the lawyer was representing in the derivative action.

*Schmidt v. Magnetic Head Corp.*, 101 A.D.2d 268, 476 N.Y.S.2d 151 (N.Y.A.D.1984), involved three different lawsuits and various motions to disqualify. The one relevant to this case dealt with the derivative action, which the court found to be a demand excused case because the director-defendant was charged with breach of his duty of loyalty by having the company do business with a corporation with which he had a secret relationship. The complaint also alleged he used Magnetic Head employees and equipment to perform work for this other corporation and that he competed with Magnetic Head through his other corporation. 476 N.Y. S.2d at 154, 160. The *Schmidt* case held that the corporate counsel could not represent the corporation and the directors in the derivative action where the corporation was not "merely a passive litigant in the dispute" but actively appeared and answered.

*Lewis v. Shaffer Stores Co.*, 218 F.Supp. 238 (S.D.N.Y.1963), involved short-swing profit taking in the purchase and sale of the corporation's securities by its directors, officers, and a majority shareholder. *Lewis* again held that the same lawyer could not represent both the corporation and the individual director-defendants. Finding that their interests were "clearly adverse," the district judge concluded that "it would be wise for the corporation to retain independent counsel." 218 F.Supp. at 240.

These conflict cases are not applicable to the present situation where BSD & D is not representing the directors and the corporation, but solely the corporation. It might also be noted that the cases cited by the plaintiffs involve fact situations that either did or would have qualified as demand excused situations.

undermine [the individual defendant's] position personally. Yet, in this particular litigation, counsel for UMWA should be diligent in analyzing objectively the true interest of UMWA as an institution without being hindered by allegiance to any individual concerned.

448 F.2d at 1179. The D.C. Circuit analogized to a stockholders' derivative suit where ordinarily the same counsel should not represent the corporation and the individual director-defendants.

If BSD & D represented any of the individual defendants in other matters related to this derivative case, then *Yablonski* would be applicable. But there are no facts presented showing the Barris, Sott firm represent any of the individual defendants in other cases or other legal matters. Thus, *Yablonski* does not preclude Eugene Driker's representing Consumers Power and its Advisory Committee. The Honigman firm does represent the directors in this case and the securities case. While HMS & C was active as a consultant, the firm was not counsel for the Advisory Committee. Thus, *Yablonski* would not apply to them with respect to undermining the independence of the Advisory Committee.

In addition to the cases on conflicts involving lawyers representing differing parties with conflicting interests in the same litigation, plaintiffs also cite two other cases in which defendants asserted a defense that they had acted in reliance on advice of counsel. In both cases, the courts rejected that defense by finding the legal advice they relied upon was tainted because of conflicts of interest of the advising attorneys, and thus could not provide the defense of reasonable reliance upon the advice of counsel.

*Arthur Lipper Corp. v. Securities and Exchange Commission*, 547 F.2d 171 (2d Cir.1976), found that an independent broker-dealer involved in a disciplinary action before the SEC did not have a valid defense of having relied on the advice of counsel because the broker-dealer acted on the advice of an attorney who was also counsel for the corporation whose transactions were being challenged. The court noted that while *information* from the corporation's attorney could be obtained since he was familiar with the situation, that information should have been evaluated and filtered through an *independent attorney* for the broker-dealer before he could safely rely upon it. In the present case, the Advisory Committee had separate counsel available for such a purpose with respect to information provided by HMS & C and others. Also, unlike *Arthur Lipper* case, the advice of HMS & C was not on the legitimacy of their individual clients' behavior. The *Arthur Lipper* case is not applicable to Eugene Driker and BSD & D for two reasons: first, they were not counsel for any of the individual directors; second, as counsel for the Advisory Committee, Mr. Driker did not give advice on the underlying challenged transactions of the individual directors. *Arthur Lipper* is not applicable to BSD & D merely because they were defending the corporation against similar counts in the *Dow* case.

*Papilsky v. Berndt* [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH), ¶ 95,627 (S.D.N.Y.1976), was a derivative action against defendants who managed a mutual fund and failed to take advantage of recapturing certain broker commissions that would have benefitted the fund. The defendants argued that they did not authorize the recapture of commissions, and did not advise the independent directors of the possible legality of such recapture, because of advice of counsel, the law firm of Dewey, Ballantine, Bushby, Palmer & Wood that such recaptures were not permitted. Judge Marvin Frankel found that the defendants could not defend on the claim that they reasonably relied on the advice of Dewey, Ballantine. First, during the relevant period of time the Dewey, Ballantine firm was involved in a close and continuing discussion with co-defendant Lord, Abbett, the creator of the fund and principal underwriter or distributor of fund shares. It was Lord, Abbett's commissions that would have been off-set by recaptures. Dewey, Ballantine had been outside counsel for both Lord, Abbett and the fund. Indeed, one of Dewey, Ballantine's associates had

become in-house counsel to Lord, Abbett.[48] In addition to the defendant Fund Directors (whose position would parallel the Advisory Committee in the *Consumers* case) receiving legal advice from a law firm with conflicting interests, *Papilsky* had a substantial "plus factor" undermining defendants' claim of good faith reliance. Those directors relied on the Dewey, Ballantine advice notwithstanding substantial contrary data available to them regarding the legality of recaptures. The SEC, various stock exchanges, and academic commentators had stated forcefully that recapture of commissions was legally possible and in the shareholders' interest. The *Papilsky* defendants even admitted at the time of the lawsuit that they were wrong on the recapture issue and that it would have been in the shareholders' interest for the Fund to have recaptured commissions.

For the *Papilsky* case to parallel the present case, there must be either a conflict of interest or some other reliable contrary data, or both. Only HMS & C might have an actual conflict, but again the Consumers' Advisory Committee was not represented by HMS & C. Nor was HMS & C the Advisory Committee's sole source of advice. Second, on the second critical element of *Papilsky*, the Consumers' directors did not receive any conflicting opinions, as had the directors in *Papilsky*. It is not enough that the Attorney General of the State of Michigan or that the derivative plaintiffs were accusing the directors of Consumers Power of mismanagement and fraud. That was *not* an issue upon which the Advisory Committee received legal advice. The Advisory Committee hypothetically assumed it could prevail against the defendant directors. To parallel the *Papilsky* case, plaintiffs would have to show that the Advisory Committee ignored an opinion by some authoritative government body, association, respected lawyer, or academic which substantially contradicted the advice of BSD & D, HMS & C, and others that pursuing the derivative action would have a substantial negative impact upon the *Dow* case in Midland, the class action case, and the rate case, and that the aggregate dollar values involved in these other matters far exceeded any possible financial gain from the derivative suit. Unlike the defendant directors in the *Papilsky* case who later admitted they were wrong, the Advisory Committee has made no such admission of error regarding the negative impact of the derivative action on Consumers' other litigation and corporate efforts. Nor can plaintiffs point to any respected opinion that Consumers' pursuit of the derivative action would not have a substantial detrimental effect upon Consumers' position in these other law suits and the rate petition. Plaintiffs have no evidence in the present case that would have put the Advisory Committee on such inquiry notice that they were not getting legitimate and *bona fide* opinions from the Honigman and Barris, Sott firms regarding the negative impact of the derivative action upon the *Dow* litigation and the Consumers Securities litigation. Thus the facts of this case are substantially different from those in *Papilsky*.

---

**48.** In effect, Lord, Abbett and Dewey, Ballantine presented a unified and weighty body of opinion opposing any and all suggestions of recapture, or even of independent study:

> Dewey, Ballantine, in advising both Lord, Abbett and Affiliated Fund, was counseling people with contrary interests. This is not to question the earnest good faith with which they gave their advice (although it was exceedingly "casual" ..., in that it was unwritten, informal, omitting, *inter alia*, inquiry to the various regulatory bodies). The effect of the inadequate advice was to discourage any independent inquiry by Affiliated Fund's Board. The result was a failure by defendants to meet their duty of keeping the independent directors fully informed of possible conflicts, and of possible methods of recapture, so that a truly independent inquiry could be made. The presentation to the Board gave the independent directors, who were not sophisticated in the investment company field, no reason to believe recapture was possible or desirable. Yet, defendants now admit it was desirable for the shareholders. Nevertheless, defendants were excessively willing, approaching eagerness, to dismiss without inquiry or full disclosure, the statements of the SEC, the exchanges, and of various commentators, and to rely blandly on the advice of illegality.

*Papilsky v. Berndt, supra,* at 90,133 (footnote omitted).

## B. The Lack of Thoroughness Claims

### 1. Failure to Review the Merits and Undertake a Damage Study

Indeed, an ideal investigation and evaluation of the plaintiffs' demand would have involved an independent counsel who could make a thorough and independent investigation of the merits of the claim against the directors and an analysis of its impact on the liability and damages issues of the securities case and the *Dow* case, the relation of Consumers to Bechtel, and the pending rate case.

Indeed, in a perfect world, where time and expense were no object, the Advisory Committee might even have chosen the ultimate in decision-making objectivity and thoroughness—the adversary system— with separate independent counsel to investigate and present argument on both sides of the issue before the neutral Advisory Committee, who could decide the issue like a tribunal.[49]

Yet, for the business judgment rule to apply, a corporation is not required to undertake the ideal or perfect investigation— one that can anticipate all suggestions and withstand any criticism of derivative plaintiffs or of future court review. What is required is that the corporation makes a *reasonable* effort to reach an informed business decision.

Plaintiffs' counsel cites *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del.1985):

> The determination of whether a business judgment is an informed one turns upon whether the directors have informed themselves "prior to making a business decision, of all material information reasonably available to them."

What is *reasonable* depends on the circumstances and on the time, resources, and alternatives available. Also, in determining reasonableness, courts are not to second-guess the corporate decision makers' choice of procedures and substitute its standards of reasonableness for standards that reasonable business people would find acceptable.

Under the standards of *Auerbach v. Bennett*, 47 N.Y.2d 619, 634, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979), what is required for the sufficiency or thoroughness of a committee investigation is also a determination that the activities demonstrated a reasonable competence and completeness in their inquiry. *Auerbach* interprets this as requiring the plaintiffs who are attacking thoroughness to show that the investigation undertaken was "so restricted and so shallow in execution, or otherwise 'so *pro forma* and half-hearted' as to constitute a pretext or sham...." *See also Genzer v. Cunningham*, 498 F.Supp. 682, at 696 (E.D.Mich.1980).

This Court can take judicial notice that the allegations of mismanagement involved in this case, the *Dow* litigation, and the class action securities action involved multiple events and claims of mismanagement spanning several years. We can also take judicial notice of public dockets that the *Dow* litigation lasted over three years, including two years of intermittent trial before Midland County Circuit Judge David S. DeWitt before that matter was settled short of a judicial decision. The initial complaint in the consolidated class action of *In Re Consumers Power Company Securities Litigation*, 83–CV–6448–AA (E.D. Mich) was filed in November 1983. The records in this class action show that the class action plaintiffs inherited thousands of pages of documents from the *Dow* litigation. Yet, the court records demonstrate that notwithstanding this substantial discovery short cut, discovery is not yet completed in that class action case although trial is scheduled for the Fall of 1990. Thus it is beyond question that any effort of the Consumers' Advisory Committee to get independent and formerly uninvolved counsel to review the merits of the deriva-

---

**49.** As Sir Thomas More's steward, Matthew, lamented about the lack of an ideal world:

> I wish we could *all* have good luck, *all* the time! I wish we had wings! I wish rainwater was beer! But it isn't ... [W]hat with not having wings but walking—on two flat feet; and good luck and bad luck being just exactly even stevens; and rain being water—"

Robert Bolt, *A Man for All Seasons,* (New York: Random House, 1960), Act II at 97–98.

tive claims would have been enormously expensive and time consuming.

In addition to criticizing the Advisory Committee for not evaluating the merits, plaintiffs fault the Advisory Committee for not having undertaken a damage study.[50] Again this Court can take judicial notice of the court pleadings, including plaintiffs' complaint, as well as the pleadings filed in the securities and *Dow* actions. These court pleadings upon which a damage study would be based demonstrate the enormity of such a task. In the *Dow Chemical* case, Dow sued for $60,000,000. As plaintiffs' acknowledge, Consumers was counterclaiming for $460,000,000 (Plaintiffs' Second Amended Consolidated and Supplemental Complaint, docket # 1, February 8, 1987, ¶ 49). In the securities action, the damages would appear very substantial and exceedingly difficult to estimate. There were seven counts and eventually seven certified classes, five involving common stock and two involving preference stock. Six of the classes involved in excess of 17,000,000 shares (Second Amended and Supplemental Class Action Complaint in *In re Consumers Power Co. Securities Litigation*, 83–CV–6448–AA, ¶ 46). In addition, there was a 20 month period in which an "open market class" was certified for all transactions in Consumers common stock on all markets on which that stock was traded. Pleadings demonstrate that the stock was traded on six stock exchanges. Plaintiffs' complaint notes that as of December 1984 there were in excess of 88,000,000 shares of common stock owned by 175,000 shareholders (Plaintiffs' Second Amended Consolidated and Supplemental Complaint, docket # 1, February 8, 1987, ¶ 22). These figures are very close to the figures used in the securities action complaint, which claims that on December 31, 1983, the end of the alleged 20 month fraudulent period of fraud on the open market, Consumers had 189,000

shareholders involving in excess of 86,000,-000 shares of common stock. (Plaintiffs' Second Consolidated Amended and Supplemental Class Action Complaint in *In re Consumers Power Co. Securities Litigation*, 83–CV–6448–AA, docket # 85; filed June 10, 1985, ¶ 46). A damage study would involve a determination of how many of these 80–plus million shares were traded in the 20 month open market period, and then determining for each sale how much of a loss the stockholder incurred because of the alleged Consumers' wrongdoing.

Indeed, in the Fall of 1986, when the Advisory Committee considered the derivative plaintiffs' demand, Judge Joiner had only certified five classes in the securities case involving 12,000,000 shares of specific new stock offerings plus the open market class. It was not until August 16, 1988, that two preference stock classes, including 5,000,000 shares, were certified by this Court for class treatment. In addition, docket entries show that it was not until April 27, 1990, that this Court clarified that the open market class for all stock transactions over a 20 month period from March 17, 1982 through November 1983 would only include the 80–plus million shares of common stock, and not the additional 20–plus million shares of preferred and preference stock that had been issued by Consumers. This Court could also judicially note that a 1989 public status conference in the *Consumers Power Securities Litigation* class action demonstrated that no damage study had yet been undertaken by the plaintiffs or defendants in the securities case, even though that case was in the sixth year of litigation. Given the fact that the plaintiffs' demand letter of August 15, 1986, insisted upon a "prompt[ ]" reply, and gave defendants "thirty (30) days from the date of this letter" to respond, a sophisticated damage study by the Advisory Committee would, to say the least, have been difficult. Under the totality ⌐ the circum-

---

**50.** Plaintiffs in their brief object to Mr. Moscow—with Mr. Driker's concurrence—accepting as an estimate of the liability in a securities class action case a figure of damages in excess of $600,000,000, which was based upon quotes from plaintiffs' counsel reported in the newspa-

per (Plaintiffs' Brief at 12). Plaintiffs assert that Mr. Moscow acknowledged that he was aware of no securities lawsuit achieved a recovery close to that figure. He also acknowledged that he never commissioned a damage analysis.

stances, the failure of the Advisory Committee to undertake a damage study could not be found an unreasonable lack of thoroughness by any reasonable factfinder.[51]

Returning to the merits of the derivative claim, it should be noted that the claims of mismanagement in this case, as in the securities case, dealt with a period in excess of six years.[52] A review by independent counsel would have taken months. The only practicable alternative, as plaintiffs virtually acknowledge at page 8 of their brief, would be to involve counsel already educated in the case, such as BSD & D or HMS & C, to review for the Advisory Committee the merits of the mismanagement claims and assist them in interpreting the legal strengths and weaknesses of such claims.

Yet it is precisely on a review of the merits of the derivative claims against the individual directors that plaintiffs' counsel could make the loudest complaints of alleged adversarial *bias* or possible outright *conflict* (HMS & C). In addition, such effort of the Advisory Committee to take an abbreviated tour through the hundreds of thousands of pages of discovery documents would surely be subject to attack by the derivative plaintiffs for *lack of thoroughness*. Finally, if a detailed review of the merits of the case was to be among the reports to the Advisory Committee, and formed a part of the reasons for their decision, Consumers would risk that this "decision relevant" data might become available to the public and Consumers' opponents under a public disclosure order to the press such as the one upheld by the Seventh Circuit in *In re Continental Illinois Securities Litigation*.[53]

In arriving at a decision on whether to bring an independent action against its officers and directors, two areas of consideration are relevant: (1) Are the merits of the case strong enough to make it likely that the corporation could maintain a successful action against its officers and directors for wrongdoing? If there is not a winnable lawsuit, a corporation should reject a derivative stockholder's demand. (2) Even if there is a meritorious suit against the directors of a corporation, should such an action be maintained in light of other factors? In other words, once other factors are evaluated, might bringing the derivative action work a potentially greater harm to the corporation than any possible gain from that action?

In the present case, the special committee proceeded with the assumption that the answer to question (1) was that they could proceed successfully against their directors and obtain a judgment or settlement. Accordingly, they focused their time and effort on consideration of decision (2). After weighing the factors relevant to that decision, the special committee determined that litigation was not in the best interest of Consumers Power.

Such a process, that hypothetically assumes the outcome on one issue as a decision-making expedient to focusing attention to another necessary issue, is a common and acceptable method in decision theory for performing cost-benefit analysis. If such a decision-making process avoids areas of attack on the decision for bias or a lack of thoroughness, if it avoids enormous time and expense, and if it avoids the risk of public disclosure or misuse of confidential information, strategies and opinions, it is a method that reasonable board members could find acceptable. Nor is the decision-

---

**51.** As with the lack of precision in estimating litigation damages, plaintiffs also complain that Mr. Paquette, Consumers' Chief Financial Officer, gave an opinion that pursuing the derivative action would have a negative impact upon Consumers' ability to raise funds. Plaintiffs complain that Mr. Paquette never consulted with investment bankers and also did not perform any study concerning whether other companies had been impaired in their ability to obtain capital because of a stockholder derivative action (Plaintiffs' Brief at 12–13). While more could have been done by Mr. Paquette, the Advisory Committee could reasonably rely on the opinion of Consumers' Chief Financial Officer without his having to undertake further interviews or empirical studies.

**52.** Plaintiffs' February 6, 1987, Second Consolidated, Amended and Supplemental Class Action Complaint. *See also In re Consumers Power Co. Securities Litigation,* 105 F.R.D. 583 (E.D.Mich. 1985).

**53.** *See* note 20, *supra.*

maker required to turn this hypothetical decision-making expedient into a binding determination regarding the underlying facts. The Advisory Committee in considering the costs and benefits of pursuing a winnable derivative action against its directors could also consider that Consumers, with professional advice of counsel, was maintaining *bona fide* positions in the *Dow* and securities litigation, its rate case, and the S.E.C. investigation.[54]

In making the cost-benefit analysis on whether to pursue a derivative claim, a board of directors is generally not able to act with precision. In predicting the possible outcomes of litigation, investigations and the rate case, the Advisory Committee, of necessity, dealt with limited knowledge and substantial risks. They concluded that the $50,000,000 which might be obtained by success on the derivative claim against the directors[55] was outweighed by the potential Consumers' losses, possibly in excess of one billion dollars, that bringing the derivative claim might cause on Consumers' other litigation, negotiations, and the rate proceedings.

For some, such as plaintiffs' counsel, foregoing $50,000,000 to pursue a "doomed litigation" posture is folly. For others, pursuing $50,000,000 in the derivative claim at the risk of enhancing the likelihood of loss in Consumers' other litigation and corporate endeavors would be equivalent to the directors of the White Star Lines on April 14, 1912, ordering a midnight auction of the Titanic deck chairs instead of trying to save the ship. For others still, the issue lies somewhere between these extremes. It is not for this Court to decide who is right, nor to second-guess the special Advisory Committee, but only to consider whether the plaintiffs have evidence that would support a determination that the decision-making procedures were so uninformed and curtailed as to lie beyond the

parameters of behavior that would be acceptable to reasonable business people.

In the present case, plaintiffs have proffered no evidence or argument from which a fact-finder could conclude under the *Van Gorkom* test that the Advisory Committee ignored material information, including a review of the merits, "reasonably" available to them. Nor have plaintiffs submitted evidence that would support a finding under *Auerbach* and *Genzer* that the Advisory Committee's inquiry was "so restricted and so shallow in execution, or otherwise so *pro forma* and half-hearted as to constitute a pretext or sham."

### 2. Failure to Consider the Option of Remaining "Neutral"

Plaintiffs also assert that the Advisory Committee investigation was uninformed and lacked thoroughness because it "never considered the alternative of permitting a suit by plaintiffs [on] behalf of Consumers, with Consumers staying neutral" (Plaintiffs' Brief at 17). The entire Advisory Committee process was undertaken in response to the plaintiffs' demand that Consumers Power litigate in its own name against its directors. There was not an alternate demand that Consumers stand neutral if they choose not to litigate. Plaintiffs claim that this is obvious in such demands, and that a thorough consideration of Consumers' response to the demand should have included consideration of alternative positions, such as Consumers' remaining neutral and allowing the shareholders to proceed. Whether obvious or not, plaintiffs' claim regarding the corporation remaining neutral would have been substantially enhanced had they made a specific alternative demand.

Plaintiffs cite no cases that require consideration of the "neutral" stance in addition to consideration of the actual demand made upon the board. Plaintiffs assert

---

**54.** If the shadow cast by the limited assumption of the Advisory Committee was as broad as plaintiffs would have it, one would have to conclude that counsel for Consumers were acting unprofessionally in maintaining nonmeritorious defenses in the *Dow* and class action cases.

**55.** It is not unreasonable for directors to assume that the $50,000,000 officers and directors insurance was a likely value of recovery in the derivative case since the settlement leverage of "bad faith" claims make settlement at or just below policy limits a commonplace.

that the cases of *Sohland v. Baker*, 141 A. 277 (Del.1927), and *Halprin v. Babbitt*, 303 F.2d 138 (1st Cir.1962), demonstrate that this position of neutrality is a viable alternate response available to Consumers.

While "remaining neutral" and acquiescing in the plaintiffs' pursuing the derivative action against the directors without the corporation formally signing any pleadings might avoid the problem of having the derivative pleadings actively used against Consumers in the other litigation and in the rate proceeding, it is not clear that such "acquiescence" would not be deemed to be an adoptive admission of the pleading, enabling the derivative complaint to be used in the securities and *Dow* cases against Consumers as if it were a pleading signed by them.[56] Even if it could be assured that this "remaining neutral" would prevent any evidence of an admission of an inconsistent litigation position from being introduced in the securities trial or *Dow* litigation, it is unlikely that the plaintiffs in those cases would be blind to such "acquiescence" and not treat Consumers' behavior as a practical "admission" in all future negotiations with Consumers. Similarly, it is inconceivable that in the highly charged political atmosphere that often attends a rate proceeding, the Michigan Attorney General's office, various newspapers, or others involved would not note this peculiar "acquiescence" and use this inconsistency against Consumers in the rate proceeding.

Furthermore, recent case law suggests that such "neutrality" by a corporation when faced with a derivative demand is not legally viable notwithstanding the *Sohland* and *Halprin* cases cited by plaintiffs. Defense counsel cites the chancery opinion in *Kaplan v. Peat, Marwick, Mitchell & Co.*, 529 A.2d 254, 262 (Del.Ch.1987), *rev'd in part*, 540 A.2d 726 (Del 1988). In *Kaplan*, Chancellor Jacobs' Chancery Court opinion distinguished the *Sohland* case where the corporation chose not to bring the lawsuit, noting that the corporation "by their conduct affirmatively endorsed [the lawsuit's] maintenance by a stockholder suing derivatively." 529 A.2d at 262. The chancery court stressed that "[t]he essential ingredient of *Sohland* that is lacking here is the affirmative exercise of the directors' business judgment to support the derivative action." Chancellor Jacobs similarly distinguished the *Halprin* case "where the directors clearly supported the suit."[57] 529 A.2d at 262, n. 8.

The Delaware Supreme Court reversed the chancery court.[58] On the issue of

---

**56.** Under the Federal Rules of Evidence "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement of which the party has manifested an adoption or belief in its truth." FRE 801(d)(2)(B). In the criminal context, the doctrine of adoptive admission by silent acquiescence is well accepted. *See, e.g.*, 4 *Wigmore on Evidence* §§ 1071–72 (Chadbourn Rev.1972); Saltzburg & Redden, *Federal Rules of Evidence Manual* at 526 (3rd ed. 1982); *United States v. Hoosier*, 542 F.2d 687 (6th Cir.1976); *United States v. Wiseman*, 814 F.2d 826 (1st Cir.1987). Although less common, the doctrine is also applicable in a civil context. *See, e.g.*, 4 Wigmore on Evidence § 1073 (Chadbourn Rev.1972), *Ricciardi v. Children's Hosp. Med. Center*, 811 F.2d 18 (1st Cir.1987); *Southern Stone Co., Inc. v. Singer*, 665 F.2d 698 (5th Cir.1982). In order to constitute an adoptive admission by silence, the offering party must show that, under the circumstances of the case, a failure to respond is so unnatural that it supports the inference that the opposing party acquiesced in the statement. *Ricciardi, supra,* 811 F.2d at 24.

**57.** In *Halprin v. Babbitt*, 303 F.2d 138 (1st Cir. 1962), the corporation did not directly approve the derivative action, but rather it acquiesced in the action. There was evidence that the directors were content to have the plaintiffs proceed with the action. In *Halprin*, plaintiffs' counsel had asserted that the parent corporation, which owned 93% of the corporation against which plaintiffs were seeking to bring a derivative action, "did not oppose the institution of this action and desire[s] a determination on the merits of the issue averred in the complaint." *Id.* at 140. The First Circuit stated that the derivative stockholder "had received, if not express authorization, at least tacit approval." It also noted:

> [I]f the majority wishes to acquiesce in such a procedure [where a stockholder makes a demand that he be allowed to proceed at his own expense], we see no reason why it may not "stand silent and smile" and permit someone else to be the cats-paw.

303 F.2d at 141.

**58.** The Delaware Chancery Court dismissed the derivative action against Chase Manhattan Corporation for failure of the plaintiffs to make a demand. The Delaware Supreme Court noted that in one of the actions where a co-defendant,

whether a corporation can remain "neutral," the Delaware Supreme Court held:

> When a corporation takes a position regarding a derivative action asserted on its behalf, it cannot effectively stand neutral. Because of the inherent nature of the derivative action, a corporation's failure to object to a suit brought on its behalf must be viewed as an approval for the shareholders' capacity to sue derivatively. We hold, therefore, that when a corporation chooses to take a position in regards to a derivative action asserted on its behalf, it must affirmatively object to or support the continuation of the litigation.

> Thus, Chase's current position of neutrality must be viewed as a tacit approval for the continuation of the litigation.

540 A.2d at 731.

The Delaware Supreme Court later interpreted its holding in *Kaplan* as meaning:

> [W]hen a board of directors is confronted with a derivative action asserted on its behalf, it cannot stand neutral.... The Board "must affirmatively object to or support the continuation of the [derivative] litigation."

*Spiegel v. Buntrock,* 571 A.2d 767, 775 (Del.1990), quoting *Kaplan,* 540 A.2d at 731.

Thus, in light of the various factors considered above—the failure of plaintiffs to demand that Consumers "remain neutral," and the likely adverse effects of any attempt by Consumers to "remain neutral," as well as the recent suggestions by the Delaware Supreme Court that such a position is legally untenable—it cannot be said the Advisory Committee's consideration of the plaintiffs' demand was uninformed or lacked thoroughness for its failure to consider this possibility.

Peat, Marwick, Mitchell & Co., moved to dismiss for the failure of the stockholders to make a demand upon Chase, Chase had remained neutral and did not join in that motion to dismiss. Chancellor Jacobs found that Chase's neutral stance was not consent to the derivative action, and therefore that the stockholders had failed to

## VII. Conclusion & Recommendation

While the parties have submitted the full Advisory Committee report and supplemental appendix, including all of its subsidiary reports, the bulk of these documents would be relevant only if this Court were to evaluate the merits of the Advisory Committee's decision. In preparing my report and recommendation, only those limited portions of the materials to which plaintiffs' counsel has referred in its effort to attack the independence, good faith, or thoroughness of the Advisory Committee's procedures have been reviewed. Those sections individually, in the aggregate, and in conjunction with the other facts and arguments of counsel are not legally sufficient to undercut the independence, good faith, or thoroughness of the Advisory Committee's investigation. The decision of the Advisory Committee, as adopted by the Consumers' board, is entitled to the protection of the business judgment rule. Thus, the decisions of the full board to reject plaintiffs' demand and to move to dismiss this litigation are also protected by the business judgment rule. These decisions are beyond the scope of judicial review. Thus the bulk of the documents utilized by the Advisory Committee and, indeed, much of the report itself is not relevant to the limited issue before this Court. On that limited issue, the plaintiffs have failed to present sufficient facts and/or legal argument from which a reasonable fact-finder could conclude that the board's rejection of the stockholders' demand was "wrongful."

Accordingly, it is recommended that the defendants' motion to terminate this lawsuit be granted, and that the derivative claim be dismissed with prejudice.

Any objections to this Report and Recommendation must be filed within ten (10) days of its service. 28 U.S.C. § 636(b)(1); Local Rules 10(c) and C–4. Failure to file objections within the specified time consti-

make a Rule 23.1 demand. The Delaware Supreme Court found that Chase's neutral position on the Peat, Marwick motion excused the plaintiffs' failure to make a demand on them. Accordingly, it felt the chancery court should not have dismissed the case for want of a demand.

tutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Ivey v. Wilson,* 832 F.2d 950, 957–58 (6th Cir.1987); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

Dated: July 20, 1990

Ann Arbor, Michigan